Urgell Cuebas, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Las hermanas, Carmen Luz, Celia y Krimilda Báez Martínez, apelan la sentencia del Tribunal de Primera Instancia, Sala Superior de Bayamón, que declaró sin lugar su demanda sobre bienes hereditarios, respecto a los bienes de su difunto padre, Sr. Antonio Báez Berrios. Señalan las apelantes, entre otros, que incidió el tribunal apelado al rehusar declarar como una simulación absoluta y dejar sin efecto las ventas de los bienes raíces del causante a los co-demandados apelados, Antonio y Ana Báez Oyóla, hijos de un segundo.matrimonio del causante.
Procedemos a revocar la sentencia apelada y devolver el caso al tribunal apelado para que continúen los procedimientos conforme a lo aquí dispuesto.
I
Las demandantes, señoras Carmen Luz, Celia y Krimilda Báez Martínez, son hijas del primer matrimonio del causante, Sr. Antonio Báez Berrios, con la Sra. Amparo Martínez. En el segundo matrimonio del causante con la Sra. Ana María Oyóla Ortiz, procrearon dos hijos, Antonio y Ana Báez Oyóla. El causante trabajaba en la industria de la construcción, como maestro de obra, viajando alrededor de la isla y participando en la construcción de diferentes proyectos. Durante su vida acumuló ahorros en la Cooperativa de Ahorro y Crédito *749 San Miguel de Naranjito (la Cooperativa) y adquirió dos (2) solares en el Barrio Achiote de Naranjito, uno de dos mil cien metros cuadrados (2,100 m.c.) y el otro de novecientos metros (900 m.c.), sobre los cuales construyó dos viviendas.
En los últimos años de su vida, el causante estaba enfermo del corazón, habiendo sufrido varios infartos al miocardio en el período previo a su fallecimiento, el cual sobrevino el 29 de noviembre de 1992.
El 25 de enero de 1991, veintidós (22) meses antes de fallecer, el causante y su esposa, Sra. Oyóla Ortiz, otorgaron una escritura ante el notario, Ledo. Ernesto Negrón Padilla, por medio de la cual traspasaron la titularidad sobre el inmueble de 2,100 m.c. a favor de su hijo, Sr. Antonio Báez Oyóla, y su esposa, Sra. Vilma Fernández Padilla. Según la cláusula segunda de la escritura, dicha compraventa fue efectuada por el precio de cinco mil dólares ($5,000), en la cual el notario que preparó la escritura hizo constar que “confiesan los vendedores haber [lo] recibido de manos de los compradores con anterioridad a este acto”.
El 23 de abril de 1992, siete (7) meses antes de fallecer el causante, éste y su esposa otorgaron una segunda escritura, esta vez traspasando la titularidad sobre el inmueble en el cual ellos residían, a favor de su hija, Sra. Ana Báez Oyóla, y su esposo, Sr. Frank R. Morales. Dicho inmueble consiste de un solar de 900 m.c. y una estructura en hormigón de dos niveles, con siete (7) cuartos dormitorios, sala, comedor, cocina, dos (2) baños, balcón y marquesina. La cláusula SEGUNDA de la escritura indica que el precio de compraventa fue de dieciocho mil quinientos dólares ($18,500), lo que, también, hizo constar el notario que “confiesan los vendedores haber [lo ] recibido de manos de los compradores con anterioridad a este acto
A la fecha de la muerte del causante existía a su nombre una cuenta en la Cooperativa, con un balance de $7,440.81. En relación a esta cuenta, éste otorgó una tarjeta testamentaria designando como beneficiaría a su esposa, Sra. Ana Oyóla Ortiz.
Además, estaba registrado a nombre del causante un vehículo, marca Buick del 1982, el cual le había “regalado” a su hijo Antonio Báez Oyóla en el año 1982, pero que la titularidad del mismo no se había realizado ante las autoridades pertinentes.
Los gastos relacionados con el funeral del causante ascendieron a $6,995 y fueron sufragados por las dos sociedades de bienes gananciales de los hijos del segundo matrimonio, Antonio y Ana Báez Oyóla.
Las hermanas Carmen Luz, Celia y Krimilda Báez Martínez, hijas del primer matrimonio del causante, presentaron una demanda solicitando su participación hereditaria en los bienes pertenecientes a su difunto padre, contra Antonio y Ana Báez Oyóla, sus respectivos cónyuges y sociedades de gananciales, y la viuda del causante, Sra. Ana Oyóla Ortiz.
El 14 de agosto de 1996 se celebró la vista y el 5 de septiembre de dicho año el tribunal apelado emitió sentencia. Dicha sentencia declaró sin lugar la demanda sobre bienes hereditarios, excepto que dispuso que en relación al vehículo procedía la partición de éste, cuyo valor monetario fijó en mil quinientos dólares ($1,500).
Inconformes, las demandantes apelan señalando, entre otros, que incidió el tribunal a quo al no determinar que las compraventas de los inmuebles eran actos nulos, por constituir las mismas una simulación absoluta, ya que carecían de causa, y por no concluir que debido a ello el peso de la prueba recaía sobre los co-demandados.
Mediante resolución de 27 de abril de 1999, admitimos la presentación de la transcripción de la vista evidenciaría y concedimos término a las partes para la presentación de alegatos suplementarios. Luego de *750 estudiar en detalle la trascripción de la vista, la evidencia documental presentada y los escritos de las partes, nos encontramos en posición de resolver.
II
Como vemos, los señalamientos de error están íntimamente relacionados, por lo que los discutiremos en conjunto.
En el caso de autos, no se alegó ni presentó evidencia de que el causante hubiese otorgado capitulaciones matrimoniales ni testamento. Tampoco se presentó prueba de que hubiese recibido herencias o donaciones, o que existiesen sociedades de gananciales de matrimonios previos sin liquidar, o que el causante hubiese traído bienes privativos a su último matrimonio. Por ello, aplica la presunción de que todos los bienes a su nombre constituyen bienes gananciales de su último matrimonio, el constituido con la Sra. Oyóla Ortiz. Art. 1307 del Código Civil, 31 L.P.R.A. sec. 3647.
Las normas del derecho sucesorial disponen que en una sucesión intestada, el caudal hereditario se dividirá entre los herederos forzosos, si existen los mismos. En un caso como el de autos, en los que todos los hijos sobreviven al causante, una vez se ha cumplido con el pago de las deudas y del usufructo viudal, el caudal restante se dividirá en partes iguales entre los hijos del causante.
Los Arts. 735, 737 y 743 del Código Civil, 31 L.P.R.A. secs. 2361, 2363 y 2369, disponen en cuanto a la participación en la herencia de los herederos forzosos como sigue:

“Art. 735. Legítima, definición de.

Legítima es la porción de bienes de que el testador no puede disponer por haberla reservado la ley a determinados herederos, llamados por esto herederos forzosos.

Art. 737. Legítima de hijos y descendientes.

Constituyen la legítima de los hijos y descendientes legítimos las dos terceras partes del haber hereditario del padre y de la madre. (Enfasis suplido.)

Sin embargo, podrán éstos disponer de una parte de las dos que forman la legítima, para aplicarla como mejora a sus hijos y descendientes legítimos o naturales legalmente reconocidos.

La tercera parte restante será de libre disposición.

Art. 743. Derecho del heredero a exigir el complemento de la legítima.

El heredero forzoso a quien el testador haya dejado por cualquier título menos de la legítima que le corresponda, podrá pedir el complemento de la misma. ”

La legítima de los herederos forzosos no puede ser perjudicada por donaciones inter vivos o mortis causa. A esos efectos los Arts. 578 y 596 del Código Civil, 31 L.P.R.A. secs. 2023 y 2051, disponen:

“Art. 578. Limitación a bienes que puedan darse o recibirse por testamento.

No obstante lo dispuesto en [el Art. 576] de este título, ninguno podrá dar, ni recibir, por vía de donación, 
*751
más de lo que pueda dar o recibir por testamento.

La donación será inoficiosa en todo lo que exceda de esta medida.

Art. 596. Reducción de donaciones.

Las donaciones que con arreglo a lo dispuesto en [el artículo 578] de este título sean inoficiosas, computado el valor líquido de los bienes del donante al tiempo de su muerte, deberán ser reducidas en cuanto al exceso; pero esta Reducción no obstará para que tengan efecto durante la vida del donante y para que el donatario haga suyos los frutos.

Para la Reducción de las donaciones, se estará a lo dispuesto en este Capítulo y en [los artículos 748 y 749] de este título. ”

Para determinar si las donaciones inter vivos o mortis causa son inoficiosas, se han de valorar las mismas a la fecha en que fueron efectivas. El Art. 999 del Código Civil, 31 L.P.R.A. sec. 2851, dispone:

“No han de traerse a colación y partición las mismas cosas donadas o dadas en dote, sino el valor que tenían al tiempo de la donación o dote, aunque no se hubiese hecho entonces su justiprecio.

El aumento o deterioro posterior y aun su pérdida total, casual o culpable, será a cargo y riesgo o beneficio del donatario.

Cuando el causante ha hecho donaciones inter vivos o mortis causa, es necesario colacionar las mismas, para verificar que éstas no han impactado la legítima de los herederos forzosos. De haberse afectado la misma, el exceso de las donaciones se convierte en inoficioso y el tribunal así lo ha de declarar en una demanda de petición de herencia. A esos efectos, los Arts. 746 al 749 del Código Civil, 31 L.P.R.A. secs. 2372 a 2375, disponen:

“Art. 746. Legítima, cómo se fija.

Para fijar la legítima se atenderá al valor de los bienes que quedaren a la muerte del testador con deducción de las deudas y cargas, sin comprender entre ellas las impuestas en el testamento.

Al valor líquido que los bienes hereditarios tuvieren, se agregará el que tenían todas las donaciones colacionables del mismo testador en el tiempo en que las hubiera hecho.

“Art. 747. Donaciones que se imputarán en la legítima.

Las donaciones hechas a los hijos que no tengan el concepto de mejoras se imputarán en su legítima.

Las donaciones hechas a extraños se imputarán a la parte libre de que el testador hubiese podido disponer por su última voluntad.

En cuanto fueren inoficiosas o excedieren de la quota disponible, se reducirán según las reglas de las secciones siguientes.

Art. 748. Modo de reducir los legados.

*752
Fijada la legítima con arreglo a las dos secciones anteriores, se hará la reducción como sigue:

(1) Se respetarán las donaciones mientras pueda cubrirse la legítima, reduciendo o anulando, si necesario fuere, las nutridas hechas en testamento.

(2) La reducción de éstas se hará a prorrata sin distinción alguna.

Si el testador hubiere dispuesto que se pague cierto legado con preferencia a otros, no sufrirá aquél reducción, sino después de haberse aplicado éstos por entero al pago de la legítima.

(3) Si la manda consiste en un usufructo o renta vitalicia, cuyo valor se tenga por superior a la parte disponible, los herederos forzosos podrán escoger entre cumplir la disposición testamentaria o entregar al legatario la parte de la herencia de que podía disponer libremente el testador. ”

Art. 749. Finca difícil de dividir; legatario con derecho a legítima.

Cuando el legado sujeto a reducción consista en una finca que no admita cómoda división, quedará ésta para el legatario si la reducción no absorbe la mitad de su valor, y en caso contrario para los herederos forzosos; pero aquél y éstos deberán abonarse su respectivo haber en dinero. ” (Enfasis suplido.)
El legatario que tenga derecho a legítima podrá retener toda la finca, con tal que su valor no supere al importe de la porción disponible y de la quota que le corresponda por legítima.
En el caso de autos, el Tribunal de Primera Instancia tenía que determinar la cuantía de la legítima de los herederos forzosos y dictar sentencia otorgándole una quinta parte de la misma a cada una de las tres codemandantes. El tribunal a quo concluyó que el valor de la legítima consistía solamente de la participación ganancial del causante en el automóvil Buick del año 1982, cuyo vehículo valoró en mil quinientos dólares ($1,500). Incidió al así hacerlo, pues, según veremos más adelante, el tribunal debió haber incluido en el cómputo de la legítima la participación ganancial del causante en los fondos de la Cooperativa. Además, aun si se tomase como buena la posición de los co-demandados de que la transferencia de la titularidad sobre los inmuebles constituyó una compraventa, el tribunal debió considerar que los traspasos se hicieron por un valor muy por debajo del real, lo que implica la existencia de una donación subyacente colacionable. En adición, la evidencia testifical y documental recibida por el tribunal no demostró que se pagase dicha cantidad. Por ello, el traspaso de dichos bienes a los co-demandados constituyó una donación inter vivos y procedía la inclusión de la totalidad del valor que los inmuebles tenían al momento del traspaso de la titularidad, como parte del cómputo de la legítima.
III
En relación a los fondos que dejó el causante en la cuenta de ahorros de la Cooperativa, podemos indicar que en Rodríguez Pérez v. Sucn. Rodríguez, 126 D.P.R. 284 (1990), el Tribunal Supremo expuso que según el Art. 31 de la Ley de Sociedades Cooperativas de Ahorro y Crédito, Ley Núm. 1 de 1973, 7 L.P.R.A. sec. 1131, cualquier balance en una cooperativa será pagadero a la muerte de su titular al beneficiario que éste designe en la tarjeta testamentaria, sin necesidad de cumplir con los requisitos para una donación mortis causa bajo el Código Civil. Sin embargo, aclaró que, a diferencia de los fondos provenientes de una póliza de seguro de vida, esta donación mortis causa no está exenta de colación. La misma tampoco puede vulnerar los derechos del cónyuge supérstite si la cuenta se estableció con fondos gananciales. Al respecto, a la pág. 296 de dicha opinión, expuso el Tribunal Supremo lo siguiente:
*753 “No obstante la validez formal de la donación, el Art. 31 de la Ley de Sociedades Cooperativas de Ahorro y Crédito, supra, no es licencia para que se vulneren los derechos del cónyuge viudo ni las legítimas de los herederos forzosos. A diferencia del Art. 11.330 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1133, los términos del citado Art. 31 de la Ley de Sociedades Cooperativas de Ahorro y Crédito nó protegen a los beneficiarios designados de los “acreedores y representantes del causante”. Meramente se limita a “autorizar el pago ” de las cuentas a los beneficiarios designados.”
Si el socio estableció las cuentas en la Cooperativa durante la vigencia del matrimonio en ausencia de capitulaciones, estos fondos gozan de una presunción de ganancialidad que no queda afectada de forma alguna por la citada ley especial. Art. 1307 del Código Civil, 31 L.P.R.A. sec. 3647. El Art. 31 de ia Ley de Sociedades Cooperativas de Ahorro y Crédito, supra, meramente facilita la disposición post mortem de los bienes de un socio fallecido, pero en modo alguno este artículo modifica la titularidad de las acciones.
Un socio casado podrá utilizar el mecanismo estatuido en la Ley de Sociedádes Cooperativas dé Ahorro y Crédito para disponer de la totalidad de los fondos en depósito en una cooperativa de ahorro y crédito únicamente en cuanto a sus bienes privativos. Si los fondos son gananciales, sólo podrá disponer de su porción privativa luego de la división y liquidación de la sociedad de gananciales. Véase, Méndez v. Ruiz Rivera, 124 D.P.R. 579 (1989).
Al momento de la muerte del causante, la cuenta de ahorros de la Cooperativa tenía ün balance de $7,440.81. La mitad pertenece a la viuda como parte de su participación en la sociedad de bienes gananciales. Ella es acreedora a la otra mitad también, pues fue designada por éste en la tarjeta testamentaria, párá recibiría a manera de una donación mortis causa. La Cooperativa actuó correctamente aí entregarle el balance de íá cuenta de ahorros a la Sra. Oyóla Ortiz. Ahora bien, el monto de esta última mitad, la donációri mortis cáuÉa, la cual asciende a $3,720.40, tiene que colacionarse para evitar que se afecte la legítima de los herederos forzosos. Erró el tribunal apelado al no disponer que se colacionara la misma.
IV
Respecto a las transacciones de los bienes inmuebles, examinaremos primeramente el valor de los mismos, según el informe del tasador, para luego aplicar el derecho según proceda.
El informe del tasador, Anejo IX de la apelación, págs. 30 a 55 del apéndice, indica qüe la parcela denominada Parcela A, está inscrita a nombre de la Sra. Ana Mercedes Báez Oyóla y el Sr. Erank Morales Figueroa. La misma consiste de un solar de 900 metros cuadrados (900 m.c.) en el cual está enclavada úna estructura de mil ciento veintisiete pies cuadrados (1,127 p.c.) de área de vivienda y 1,343 p.c, dedicado a balcón, garage y sótano, el cual ha sido convertido en un apartamento. La parcela está localizada aí borde de la carretera PR-884, en el Barrio Achiote del Municipio de Naranjito, a diez (10) minutos del Pueblo de Naranjito. La estructura, según descrita en el informe de tasación, es como sigue:

“b) Estructura:

(Propiedad residencial que se encuentra en su mejor uso).

Consiste de una vivienda construida de hormigón y de bloques de hormigón, cuyos pisos están terminados en losetas de terrazo. Las ventanas son de cristal en marcos de aluminio, protegidas por rejas. Los baños tienen las paredes revestidas de azulejos hasta la altura de cinco (5) pies. Se encuentra, distribuida en sala-comedor-cocina, tres (3) dormitorios, dos (2) baños y un porch. Este ubica en parte del frente de la casa, a todo lo largo del lado derecho y del posterior, protegido todo por rejas.

*754
Aprovechando el desnivel del terreno, tiene un sótano, una parte del cual se usa como garaje, el cual tiene el piso de hormigón, pero careciendo en general de terminaciones. En adición hay otra área ocupada por un pequeño apartamento cuyas ventanas son de aluminio, tipo Miami. Por estar alquilado y cerrado, el Tasador no pudo inspeccionarlo, pero se le informó que está distribuido en dos (2) dormitorios y un baño.

Esta vivienda se encuentra pintada y en buenas condiciones generales; no obstante demuestra algunas filtraciones en el techo. ”

Para asignarle valor a la Parcela A, el tasador utilizó el método de ventas comparables para el terreno y el método de costo de reproducción para la estructura, reduciendo este último en un 18%, con el propósito de reflejar la depreciación acumulada hasta diciembre de 1995. A base de ello, valoró el inmueble en $80,603. En la escritura de compraventa de este inmueble se indicó que la transacción se efectuaba por el convenido precio de dieciocho mil quinientos dólares ($18,500).
En relación a la otra parcela, denominada Parcela B en dicho informe, se indica que está inscrita a nombre de los co-demandados, Sr. Antonio Báez Oyóla y Sra. Vilma Ivette Fernández. La misma consiste de un solar de 2,100 m. c. de superficie, una estructura de 881 p.c. de vivienda y 307 p.c. de balcón y sótano. Esta, al igual que la otra parcela, está localizada en el borde de la carretera PR-884, en el Barrio Achiote de Naranjito, como a diez minutos del Pueblo de Naranjito. La descripción de la estructura, según el informe de tasación, es como sigue:

“b) Estructura:

Propiedad residencial que se encuentra en su mejor uso.

. Consiste de una vivienda construida de hormigón y de bloques de hormigón, cuyos pisos están terminados en losetas italianas. Las ventanas son de cristal en marcos de aluminio. Las paredes del baño están revestidas de azulejos hasta el techo. Se encuentra distribuida en sala-comedor-cocina, tres (3) dormitorios, un baño y un porch frontal.

Aprovechando el desnivel del terreno, tiene un pequeño sótano en la parte posterior de la casa tipo “utility”, por carecer de terminaciones.

Esta vivienda se encuentra pintada y en buenas condiciones generales. ”

Al igual que con el otro inmueble, para asignarle valor, el tasador utilizó el método de ventas comparables para el terreno y el método de costo de reproducción para la estructura, reduciendo el valor de esta última en un 10% para reflejar la depreciación de la estructura desde la fecha de su construcción hasta diciembre de 1995. Al así hacerlo, valoró el inmueble en $54,364. De acuerdo a la escritura de compraventa, el precio que se figuró para esta parcela fue el de cinco mil dólares ($5,000).
Durante la vista evidenciaría, el perito tasador, Ing. Rafael Torrech Ramos, presentó las conclusiones de su informe de tasación y contestó las preguntas que los abogados de las partes y el Juez que presidía la misma tuvieron a bien formularle. Entre otros, aclaró que su tasación era efectiva a diciembre de 1995, no a la fecha en que se otorgaron las escrituras que transfirieron la titularidad a los co-demandados. La metodología utilizada por el tasador y la opinión sobre el valor de las propiedades, a diciembre de 1995, no fueron impugnadas por la parte demandada.
*755 Con las consideraciones anteriores, sobre el valor de los bienes inmuebles y el precio de éstos según las escrituras de compraventas, veamos ahora otros hechos pertinentes a la controversia entre las partes, así como las normas de derecho aplicables a los mismos.
En Ruiz Sánchez v. San Juan Racing Assoc., 102 D.P.R. 45, 52 (1974), el Tribunal Supremo expuso, en cuanto a la revisión apelativa de las determinaciones de hechos del foro de instancia, como sigue:
“Es saludable el principio que obliga a respetar las determinaciones de hechos de un tribunal de instancia cuando éstas tienen apoyo en la prueba que tuvo ante sí. No obstante, y con base en la Regla 43.1 de Procedimiento Civil, y antes en la 52 (a) de las Reglas de Enjuiciamiento Civil de 1943, no hemos vacilado en dejar sin efecto determinaciones de hechos que, aunque sostenidas en prueba aportada, resultan claramente erróneas. Prieto v. Maryland Casualty Co., 98 D.P.R. 594 (1970); Ortiz Rodríguez v. A.F.F., 94 D.P.R. 546 (1967); Maryland Casualty Co. v. Quick Const. Corp. 90 D.P.R. 329 (1964) y Sanabria v. Sucn. González, 82 D.P.R. 885 (1961). La prueba de la demandante, bajo las circunstancias de este caso, no puede en Derecho ser considerada satisfactoria, por cuanto no produce una certeza o convicción moral. Art. 375, Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1633. La candidez es una deseable condición humana aún entrada la madurez de los años, pero no debe dejarse sorprender para provecho de la iniquidad. ”
Los co-demandados apelados trataron de sostener, sin aportar prueba convincente, que pagaron dieciocho mil quinientos dólares ($18,500) por el inmueble A y cinco mil dólares ($5,000) por el inmueble B. Una apreciación racional de la prueba no nos permite aceptar dichas aseveraciones.
En las escrituras que transfirieron la titularidad de los dos inmuebles, los otorgantes hicieron constar que las sumas correspondientes al pago del precio de los mismos las recibieron los vendedores con anterioridad al otorgamiento de las escrituras. Por ello, el notario autorizante no dio fe de haber observado el pago alegadamente efectuado. En consecuencia, la prueba para establecer que se efectuó el pago de dicho precio dependió del testimonio vertido en la vista celebrada ante el tribunal a quo y de la evidencia documental que la parte demandada presentó. Examinemos las mismas.
Los adquirentes del inmueble A, Sra. Ana Báez Oyóla y Sr. Frank Morales, trataron de establecer que habían pagado $18,500 por el mismo. El Sr. Frank Morales testificó que estos dineros provinieron de la venta, a su compañero de trabajo, Sr. Camilo Torres, de su interés en una residencia localizada en Miraflores, Bayamón. Dicha transacción generó la suma de $20,000, según su testimonio, págs. 123 a 124 y 127 de la transcripción de la evidencia, en adelante, (T.E. 123-124, 127). Según el talonario de la cuenta de cheques perteneciente al Sr. Frank Morales y la Sra. Ana Báez Oyóla, incluido a la pág. 28 del apéndice, estos fondos fueron depositados el 14 de enero de 1992 en su cuenta de cheques. Ese mismo día, por medio del cheque Núm. 239, convirtieron los fondos en un certificado de ahorro de la Cooperativa. Dicho certificado se compró a nombre de la Sra. Ana Báez Oyóla, aquí co-demandada, coadquiriente de la Parcela A. Los fondos no fueron depositados en la cuenta de los supuestos “vendedores”, sus padres, Sr. Báez Berrios y Sra. Oyóla Ortiz (T.E. 128). Este hecho queda confirmado al examinar el estado de cuenta de estos últimos en la Cooperativa, a la pág. 26 del apéndice. Dicho estado de cuenta no demuestra aumento significativo en el balance durante este período.
En cuanto al inmueble B, el Sr. Antonio Báez Oyóla testificó que pagó en efectivo los $5,000 que menciona la escritura, o sea, que dicho pago no generó evidencia documental tales como cheques o giros cancelados. En cuanto a la procedencia de los fondos, declaró que provinieron de ahorros y préstamos de sus amigos. Sin embargo, dicha parte no produjo evidencia sobre la existencia y movimiento de fondos de la supuesta cuenta de ahorros u otra fuente similar de la cual proviniesen éstos. Tampoco produjo pagarés u otra *756 evidencia de haber recibido préstamos por la referida cantidad (T.E. 92-94). De hecho, ni siquiera mencionó la institución donde guardaba los supuestos ahorros ni la persona quien, supuestamente, le hizo el préstamo de dichos fondos.
Además, los co-demandados tampoco presentaron evidencia de que los “vendedores” recibieron el dinero de la venta del inmueble B. Dicho dinero no aparece depositado en ninguna cuenta perteneciente a éstos. La parte demandada trató de remediar dicha inconsistencia alegando que los vendedores gastaron el dinero en viajes durante el año 1991. Pero aun el testimonio de sus propios testigos es inconsistente con la explicación ofrecida. La viuda, Sra. Oyóla Ortiz, testigo de los co-demandados, en su contrainterrogatorio, reconoció que durante el susodicho viaje ella y el causante se habían quedado én casas de parientes, por lo que los gastos incurridos en viajes eran sólo quinientos dólares ($500). (T.E. 67-69).
La prueba recibida se caracterizó por la ausencia de evidencia directa o circunstancial que nos mueva a aceptar que se pagó el precio de $5,000 por la Parcela B y $18,500 por la Parcela A, incluyendo las estructuras en éstas enclavadas. Lo que se desprende de ésta es la conclusión opuesta, o sea, que no se pagó precio alguno por los dos inmueble, por lo que concluimos que el tribunal a quo erró manifiestamente en la apreciación de la prueba.
Lo expresado por el Tribunal Supremo en el caso de Román Montalvo v. Delgado Herrera, 89 D.P.R. 428, 436-437 (1963), es de particular aplicación al que nos concierne. En éste, expresó dicho Foro lo siguiente:

“Consideradas todas las circunstancias, no podemos aceptar que el tribunal de instancia acogiera la última versión a todas luces desacreditada y cuyos motivos eran fácilmente discernibles. Es más bien una cuestión dé suficiencia de la prueba, de su calidad, que de apreciación. Pero si hubiera envuelto algún elemento de credibilidad de testigos; no vacilaríamos en sostener que el resultado a que llegó el Juez a quo no es el más racional ni el más justo. La aquilatación de prueba es la junción más delicada que corresponde a un tribunal de hechos. Para ello debe poner a contribución su conocimiento de la vida diaria, y confino escalpelo practicar la delicada intervención de separar los distintos elementos de la prueba y atribuirles su verdadero peso. Como dijimos en Pueblo v. Luciano Arroyo, 83 D.P.R. 573, 583 (1961), “los jueces no debemos después de todo, ser tan inocentes como para creer declaraciones que nadie más creería. ”

Luego de concluir que los apelados no probaron, mediante suficiencia de prueba, que realmente pagaron el precio que se figuró en las escrituras de compraventa, cuyo valor, además, estaba muy por debajo del que tenían, pasemos a considerar los planteamientos de las apelantes. Sostienen éstas que las transacciones transfiriendo la titularidad de los inmuebles a los apelados carecen de causa lícita, por lo que deben declararse nulas ab initio. No tienen razón.
A nuestro juicio, las escrituras otorgadas por los apelados recogen un negocio jurídico simulado. Esto es, se trata de una donación que se quiso simular como una compraventa. En Díaz García v. Aponte Aponte, 125 D.P.R. 1 (1989), el Tribunal Supremo expuso sobre este particular lo siguiente:
“Nuestro ordenamiento jurídico distingue entre la simulación relativa y absoluta. La distinción es importante por las consecuencias jurídicas que acarrea. Veamos. La simulación relativa tiene lugar cuando, bajo la falsa apariencia, se encubre un negocio realmente querido que los contratantes desean sustraer de la curiosidad e indiscreción de terceros. El caso típico de este tipo de simulación —cuya validez examinamos en La Costa Sampedro v. La Costa Bolívar, 112 D.P.R. 9 (1982)— es la compraventa con una donación subyacente. En este tipo de casos, hemos provisto para que, cumplidos unos requisitos, el contrato simulado quede eliminado y cobre vigencia el verdadero y disimulado. ”
*757 Por su parte, la simulación absoluta se produce cuando el acto jurídico nada tiene de real y meramente crea la apariencia de un negocio. En ésta, el contrato -por carecer de causa- es nulo, inexistente y no produce efectos jurídicos. Reyes v. Jusino, 116 D.P.R. 275 (1985); Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985); Hernández Usera v. Srio. de Hacienda, 86 D.P.R. 13 (1962).
La transferencia de titularidad, evidenciada por un contrato simulado de compraventa, es válida cuando su causa verdadera fue la mera liberalidad del donante, convirtiéndose el negocio en una donación. Sobre los requisitos formales para su validez, el Tribunal Supremo, en Martínez v. Colón Franco, 125 D.P.R. 15 (1989), reiteró que:
“En Hernández Usera v. Srio. de Hacienda, supra, resolvimos que todo lo que se requiere para que una donación disimulada cumpla con las formalidades del Art. 575 del Código Civil, supra, es que el contrato que la encubre se otorgue mediante escritura publica; que se describan individualmente los bienes donados; que se expresen las cargas que asume el donatario, si alguna, y que se haga constar su aceptación en la misma escritura o en otra separada, pudiendo deducirse la misma de la firma del documento simulado, ” La Costa Sampedro v. La Costa Bolívar, 112 D.P.R. 9, 26 (1982).
En el caso de autos, los negocios jurídicos fueron evidenciados por escrituras públicas, en la que se describieron individualmente los bienes. Estas incluyen la firma de los donatarios, significando su aceptación a la donación. Además, según concluimos previamente, no medió el pago del precio por los inmuebles, configurándose así los requisitos formales de una donación, según expuestos en Hernández Usera v. Srio. de Hacienda, supra. Por ende, resolvemos que el causante y su viuda, en realidad, donaron a sus hijos, habidos en el matrimonio entre éstos, los inmuebles antes descritos.
Contrario a lo reclamado por la parte apelante, no podemos concluir que exista fraude que convierta la donación en nula ab initio. Una donación hecha con la finalidad de defraudar los derechos legitimarios de algunos herederos forzosos es inexistente, por ser ilícita su causa. Hernández Usera v. Srio. de Hacienda, supra, pág. 21; La Costa Sampedro v. La Costa Bolívar, supra. El testimonio vertido durante la vista evidenciaría no nos mueve a concluir que incidió el tribunal apelado al rehusar declarar que la motivación de las dos donaciones fue la de defraudar a las hijas del primer matrimonio. De la prueba recibida se infiere que el causante era un hombre enfermo, luego de haber sufrido varios infartos al miocardio, que trató de proveer una residencia para sus hijos más jóvenes. Al así hacerlo, denota el deseo de proteger y proveer para el bienestar de éstos y sus familias inmediatas, donándoles un lugar donde vivir, y no la intención de defraudar a las hijas del primer matrimonio.
La causa para las transferencias de la titularidad a los apelados debemos reputarla como la mera liberalidad de los padres, hasta entonces titulares de las parcelas. Estos últimos quisieron donarles el valor total de los inmuebles a sus hijos, aquí apelados. Claro está, para los fines del caso de autos, se tomará la mitad del valor de los bienes donados, que es la participación que tenía el causante en los mismos a través de la sociedad de gananciales, ya que la otra mitad corresponde a su esposa.
Finalmente, es de rigor señalar, en cuanto a los inmuebles aquí concernidos, que el Art. 999, supra, dispone que para propósito de la colación de las donaciones se debe tomar en cuenta el valor que éstas tenían al momento de la donación. Como señalamos anteriormente, el tasador no determinó el valor a la fecha de las donaciones, sino a diciembre de 1995. Para obtener el valor a la fecha de la donación, es necesario que, como paso preliminar, examinemos dos aspectos que estuvieron en controversia ante el tribunal apelado, a saber, cuál fue la fecha efectiva de la transferencia de la titularidad de los inmuebles y si a esa fecha estaban ep las mismas condiciones en que se encontraban cuando el tasador inspeccionó y valoró los mismos, er> diciembre *758 de 1995.
La parte demandada trató de probar, a través del testimonio de sus testigos, que la transferencia de la titularidad sobre los inmuebles ocurrió en una fecha anterior a aquélla en la que se otorgaron las escrituras. El tribunal apelado acogió dicha posición. En la pág. 3 de la sentencia se indica que se había perfeccionado un contrato de compraventa en el año 1989, a favor de los co-demandados, Sra. Ana Báez Oyóla y Sr. Frank R. Morales, respecto a la Parcela A, a pesar de que la escritura se otorgó el 23 de abril de 1992. Además, señaló el tribunal que la compraventa de la Parcela B, a favor del Sr. Antonio Báez Oyóla y su esposa, se perfeccionó en el año 1989, aunque la escritura se otorgó el 25 de enero de 1991.
El tribunal apelado incidió al concluir lo anterior, pues nuestro ordenamiento jurídico requiere que los actos y contratos que tengan por objeto la creación, transmisión, modificación o extinción de derechos reales sobre bienes inmuebles deberán constar en documento público. Art. 1232 del Código Civil, 31 L.P.R.A. sec. 3453. Aunque un acuerdo verbal, o en instrumento privado, puede tener efecto entre las partes previo al otorgamiento del instrumento público, el mismo no es oponible ante terceros. Más v. Llona, 31 D.P.R. 30, 33 (1922); De la Torre & Ramírez v. Navajas, 34 D.P.R. 442 (1925).
En el caso de autos, la fecha de transferencia de titularidad de los inmuebles tiene tangencia y afecta a terceros, las aquí apelantes. Esto es así, ya que ésta juega un papel indispensable a los fines de determinar el valor de los bienes del caudal relicto sobre los cuales tienen interés las apelantes. Por otro lado, toda vez que hemos concluido que los apelados no probaron mediante prueba suficiente en derecho que, en efecto, hubiesen adquirido los inmuebles mediante compraventa, realizando el pago correspondiente y por el valor razonable que éstos tenían, sino que en realidad lo que ocurrió fue una donación, la fecha para la transferencia es aquella establecida en las escrituras y no una anterior. Esto se debe a que para que una donación de un inmueble sea efectiva y válida, debe hacerse en escritura pública. Arts. 575 y 1232 del Código Civil, 32 L.P.R.A. secs. 2010 y 3453.
En relación a la controversia sobre si la condición de los inmuebles al momento de la transferencia de titularidad, o sea, a la fecha de las correspondientes escrituras, era sustancialmente la misma que a la fecha en que éstos fueron examinados por el tasador, la parte demandante presentó evidencia documental y testifical para sostener que la condición de los inmuebles era sustancialmente la misma.
En cuanto a la Parcela A, la parte demandante presentó una escritura fechada 23 de abril de 1992, que transfirió la titularidad sobre dicho inmueble a favor de los co-demandados, Sra. Ana Báez Oyóla y Sr. Frank Morales, con el propósito de demostrar que la estructura se encontraba básicamente en la misma condición que cuando fue examinada y tasada por el perito tasador. Dicha escritura incluye, un acta de edificación, como sigue:

“SEGUNDO: Que los vendedores adquirieron [el predio de terreno] mediante compraventa... el día veintiocho (28) de agosto de mil novecientos setenta y cuatro (1974).

TERCERO: Manifiestan los [vendedores] que mientras estaban casados entre sí edificaron sobre la finca descrita en el párrafo PRIMERO de esta escritura, una estructura de hormigón confines residenciales de dos (2) niveles que mide cuarenta y ocho pies con cinco pulgadas de largo por treinta y ocho pies y cinco pulgadas de ancho que consiste en siete (7) cuartos-dormitorios, sala, comedor, cocina, dos (2) baños, balcón y marquesina.

CUARTO: Yo, el Notario suscribiente, CERTIFICO haber constatado en persona y sobre el terreno la 
*759
existencia de dicha Edificación tal y según descrita:. (Enfasis suplido.)

QUINTO: A los fines legales pertinentes se solicita la inscripción de dicha edificación. ”

Como denota la parte citada, la fe notarial avala el hecho de que la estructura ya estaba construida con las características allí descritas, o sea, en hormigón, a la fecha del traspaso de la titularidad, 23 de abril de. 1992.
En cuanto a la Parcela B, cuya titularidad fue transferida a favor de los co-demattdados, Sr. Antonio Báez Oyóla y Sra. Vilma Fernández, mediante escritura fechada 25 de enero de 1991, la parte demandante presentó el contrato de arrendamiento de la misma para ¿1 año 1990-1991. El contrato fue otorgado el 29 de agosto de 1990 por el causante, actuando como arrendador, a favor de la Sra. Eva López Torres, como arrendataria. Dicha arrendataria declaró que, a la fecha en que el causante le arrendó la casa, la propiedad se encontraba en la misma condición que aparece en las fotos incluidas en el informe de tasación. En tanto que la transferencia de titularidad se efectuó cinco meses posterior a firmarse el contrato de arrendamiento, la evidencia presentada por la parte demandante es demostrativa de que la estructura sobre la Parcela B ya estaba construida cuando se efectuó el cambio de titularidad, 25 de enero de 1991, y que a dicha fecha se encontraba en las mismas condiciones que en diciembre de 1995, fecha en que fue inspeccionada por el tasador.
La parte demandada trató de sostener que ellos habían hecho mejoras después de adquirir los inmuebles, pero el testimonio de los testigos presentados por dicha parte, fue inconsistente sobre este punto. En efecto, podemos señalar que las partes sustanciales de los testimonios vertidos por dichos testigos son consistentes con la proposición de que a la fecha de la transferencia de la titularidad de los inmuebles, las estructuras que enclavan en éstos ya habían sido edificadas y estaban en las mismas condiciones en que se encontraban cuando fueron inspeccionadas por el tasador, en diciembre de 1995.
La viuda, Sra. Oyóla Ortiz, testificó en el interrogatorio directo de su abogada sobre la estructura enclavada en la Parcela A (T.E. 63-64) como sigue:

“Leda. Colón:

Cuando se hizo la escritura para abril de 92, que fueron ante el abogado-notario Ernesto Padilla Negrón, [¿]ya las mejoras estaban realizadas?

Sra. Oyóla:

Algunas, abajo estaba ya hecho. 

Leda. Colón:

[¿]Qué mejoras se le han hecho después del 92 a la casa?

Sra. Oyóla:

Pues, tratamiento en el techo, las rejas porque estaban deterioradas, rotas, que estaba toda mohosa y como era a la orilla de la carretera y esté la bebé que se puede ir y romperse la reja y caer a la carretera. ”
Las mejoras posteriores a la transferencia de titularidad arriba mencionadas constituyen parte del *760 mantenimiento normal de una residencia.
Igual conclusión se desprende del testimonio del co-demandado, Sr. Frank Morales, quien al preguntársele sobre qué mejoras estaban hechas al momento de otorgarse la escritura, respondió que a esa fecha ya estaba hecha “la planta de abajo completa. ” (T.E. 127).
Es pertinente, además, el testimonio del dueño de la Ferretería El Guareto, donde se compraron la mayor parte de los materiales para la vivienda incluida como parte de la Parcela B y para las mejoras a la vivienda de la Parcela A. Según dicho testigo, la persona que encargó el grueso del material y quien pagaba por éstos, era el causante. (T.E. 98, 102-103). Las compras recientes por el co-demandado, Sr. Antonio Báez Oyóla, consistieron de material para una casita de muñeca y “unos arreglitos pequeños en la casa”. (T.E. 100).
En adición, el Sr. Juan Ramón Cruz Suárez, un “handyman” que participó en la construcción de la vivienda en la Parcela B y en las mejoras hechas a la estructura sita en la Parcela A, testificó que las mismas se hicieron durante los años 1989 y 1990. (T.E. 109-117).
Al examinar la evidencia testifical que surge de la transcripción, así como la prueba documental, concluimos que, a la fecha en que se otorgaron las escrituras, las estructuras enclavadas en las Parcelas A y B se encontraban en las mismas condiciones que cuando fueron inspeccionadas y tasadas por el Ing. Torrech Ramos en diciembre de 1995.
Las tasaciones de los dos inmuebles son efectivas al 29 de diciembre de 1995. El Art. 999 del Código Civil, supra, dispone que al colacionarse las donaciones se ha de usar el valor de las mismas al momento de la donación. Por ello, es necesario obtener el valor de la Parcela A efectivo al 23 de abril de 1992 y el de la Parcela B efectivo al 25 de enero de 1991.
Según antes concluimos, a la fecha en que fueron otorgadas las escrituras, las estructuras estaban en la misma condición que cuando éstas fueron examinadas por el tasador. Para obtener la valoración de cada uno de los inmuebles, efectiva a la fecha de la correspondiente escritura, es necesario que el tasador provea al tribunal los factores necesarios para ajustar el costo de reproducción de las estructuras a dichas fechas. Además, ha de proveer una valoración de los terrenos, efectiva a las mismas fechas. Dicha valoración ajustada a la fecha de las escrituras, es la cantidad por la que han de colacionarse las donaciones de los referidos inmuebles.
En cuanto al automóvil, el tribunal apelado valoró el mismo en $1,500. La misma es razonable, considerando los años de uso que tenía el vehículo al fallecimiento del causante. Concluimos que no incidió el tribunal al valorar el automóvil, Buick del año 1982, en $1,500.
V
A tenor con las consideraciones antes expuestas, se modifica la sentencia apelada a los efectos de decretar que al momento de otorgarse las escrituras de compraventa de los inmuebles en controversia, realmente se efectuaron unas donaciones inter vivos a favor de los apelados. Por constituir dichos inmuebles, bienes gananciales, sólo se tomará en consideración, para propósitos de la reclamación de las apelantes, la mitad del valor de los mismos, que era la participación del causante. Además, se resuelve que el dinero recibido de la Cooperativa por la Sra. Oyóla Ortiz, correspondiente a la participación del causante en los mismos, constituye una donación mortis causa a favor de ella. Todas las donaciones anteriores deberán colacionarse, según antes hemos indicado, a fin de que se determine la participación de las apelantes en el caudal relicto de su padre.
Así modificada, se confirma la sentencia emitida por el Tribunal de Primera Instancia. Los procedimientos *761 continuarán ante dicho foro, en forma compatible con lo aquí provisto.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2000 DTA 27
1. La parte demandante presentó como testigos a la codemandante, Sra. Carmen Luz Báez, a la Sra. Eva Nydia López Torres, quien fue arrendataria de uno de los inmuebles y como perito tasador, al Ing. Rafael Torrech. Por la parte demandada, testificaron tres de los co-demandados, la viuda, Sra. Ana Oyóla, su hijo Antonio Báez Oyóla y el esposo de la Sra. Ana Báez Oyóla, Sr. Frank Morales Figueroa. Además, esta parte presentó otros dos testigos, los cuales tuvieron envolvimiento incidental en la construcción y mejoras a las estructuras enclavadas en los inmuebles.
2. En el caso de autos, solamente la parte demandante presentó evidencia del valor de los bienes inmuebles.
3. La valoración de la parcela A, es como sigue:

“Valor del Solar $11,700

Valor de la Estructura $84,028

18% depreciación ($15,125)

Total $80,603”.

4. La valoración de la parcela B es como sigue:

“Valor del Solar $15,700

Valor de la Estructura $42,960

10% depreciación ($4,296)

Total $54,364".

5. La sentencia apelada es inconsistente, ya que en el quinto párrafo de la pág. 4 indica que la compraventa-de la Parcela A se perfeccionó en el año 1991.
6. La principal mejora a la vivienda de la Parcela A, discutida por los testigos en la vista evidenciaría, fue el reemplazo de la paredes divisorias de la planta baja, las cuales eran de madera, por paredes de hormigón.
7. La totalidad del testimonio vertido nos lleva a concluir que este comentario se refiere a la mejora principal hecha ala estructura de la Parcela A, el reemplazo de las paredes divisorias de madera que tenía la planta baja por paredes de concreto.