Luz María Ortiz Rodríguez y Otros, demandantes y recurridos, *v.* Autoridad de las Fuentes Fluviales de Puerto Rico, demandada y recurrente.

*Número:* R-63-262      *Resuelto:* 19 de mayo de 1967

*José Antonio Arabía* y *Carlos Santos Correa,* abogados de la recurrente; *Héctor Lugo Bougal, C. J. Irizarry Yunqué* y *Donald R. Dexter,* abogados de los recurridos.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Se trata de varias reclamaciones contra la Autoridad de las Fuentes Fluviales de Puerto Rico con motivo de un accidente ocurrido el 28 de febrero de 1959 en la Colonia Florida, de la población de Santa Isabel, al desprenderse un alambre que conducía energía eléctrica y venir en contacto con el mismo los obreros Severo Flores Santiago, quien falleció electrocutado, y José Guzmán Ortiz, quien resultó lesionado. En la demanda incoada por el Administrador del Fondo del Seguro del Estado, en subrogación de la suma satisfecha a Feliciana Flores Alicea, alegóse que la negligencia de la demandada consistió en "no mantener dichas líneas [de alta tensión] a una altura de seguridad ya que las mismas estaban desprendidas y haciendo contacto con el terreno . . . y sin estar dichas líneas debidamente aisladas". En las otras dos demandas radicadas por la concubina y familiares del occiso y por el lesionado se atribuyó a la falta de mantenimiento de las

líneas "en buen estado y suficientemente seguras y fijas a sus postes para impedir desprendimientos . . . además, al no ejercer la debida diligencia para interrumpir la corriente y restaurar [*sic*] el alambre desprendido prontamente, a pesar de haber sido requerida para ello por el mayordomo de la Colonia Florida, requerimiento que le fue hecho a través de un empleado de dicha demandada a cargo del servicio de electricidad en dicho sitio".

La posición de la demandada ha sido que las líneas fueron instaladas y mantenidas siguiendo las normas de seguridad para esta clase de instalaciones; que tan pronto tuvo conocimiento de la avería sus empleados desconectaron el flujo de la corriente eléctrica por los cables y procedieron a su reparación; que, por la forma en que presta sus servicios a través de la zona rural de Puerto Rico, al momento de partirse el cable no tenía control sobre las líneas; y, finalmente, que el desprendimiento del alambre que causó el accidente se debió a una causa ajena, a saber, que el poste que lo sostenía y sus cables tensores fueron sometidos a fuertes y bruscos movimientos al intentar desatascar un carretón cargado de cañas que se había enredado en el alambre tensor, los cuales produjeron una grieta entre el poste y el terreno en que éste estaba hincado, la rotura de una cruceta y de unas espigas que sostenían los aisladores en otras partes de la línea y la del alambre.

El tribunal de instancia declaró con lugar las demandas. Concluyó que la negligencia de la demandada consistió en (a) no ejercer la adecuada supervisión sobre el tendido de líneas en el sector donde ocurrió el desprendimiento y al dejar de prestar atención a una queja sobre la existencia de una avería en el poste del cual se desprendió el alambre, (¹)

---

(¹) Esta conclusión de derecho se funda en la siguiente determinación de hechos:

"4.—La noche del 26 de febrero de 1959, o sea, dos noches antes de la fecha en que ocurrió el accidente, Rafael Famanía Ortiz, empleado de

y, (b) falta de supervisión y reparación en las líneas eviden-
ciada por "la situación misma en que estaban colocadas las lí-
neas, la condición de deterioro en las crucetas de los postes
y en las espigas de maderas que sostenían las líneas,
las cuales llevaban de instaladas más de veinte años".

■ El apuntamiento básico de la demandada recurrente
gira en torno a la forma en que ocurrió el accidente y su causa.
Para sostener sus respectivas posiciones las partes ofrecie-
ron extensa prueba testifical, pero a nuestro juicio, más
decisiva y elocuente, amplia prueba documental consistente
en fotografías y diagramas, testimonio pericial y el resultado
de un experimento realizado ante el tribunal para relacio-
narlo con el exhibit T de la parte demandada que consistió
del pedazo de alambre que permaneció unido al aislador en
el poste después del desprendimiento. Hemos leído y releído
la transcripción de evidencia. Hemos examinado detenida-
mente las fotografías confrontándolas con las declaraciones y
explicaciones de los testigos. Hemos pesado el testimonio pe-
ricial y considerado la evidencia material presentada. Inde-
pendientemente de que en relación con la apreciación de la

---

Luce & Company que vivía en una casa cercana a dicho sitio y la cual
era servida por las líneas del circuito secundario que partían del trans-
formador colocado en el poste 309-15, mientras observaba la televisión a
eso de las ocho de la noche, oyó una explosión proveniente de dicho poste,
quedándose su casa sin luz. Pudo observar que de las líneas próximas a
dicho poste brotaba una 'candela como verde' según su propia descripción.
De ese hecho notificó al otro día a su jefe, que lo era el señor Pablo Torres
Barranco y por indicaciones de éste se dirigió hacia las oficinas de la
Autoridad de las Fuentes Fluviales en el pueblo de Santa Isabel, donde
informó de lo ocurrido a un empleado de dicha Autoridad de nombre
Salvador Serrano. A pesar de que dio este aviso a dicho señor Serrano a
las siete de la mañana del 27 de febrero, no se reparó la avería ni volvió
a tener luz el señor Famanía Ortiz en su casa hasta después que ocurrió
la muerte de Severo Flores. Dicha avería había afectado también la resi-
dencia de Jesús González también vecino de dicho sitio y un motor para
una bomba de agua, debido a que había quedado interrumpido el sumi-
nistro de energía eléctrica del circuito secundario y así estuvo durante
todo el día 27 de febrero, durante la noche de ese día y hasta después
del accidente."

evidencia documental y pericial estamos en las mismas condiciones que el tribunal de instancia, *E.L.A.* v. *Fonalledas Córdova*, 84 D.P.R. 573, 595 (1962), no podemos convenir en que las conclusiones de hecho del juez sentenciador representan el balance más racional, justiciero y jurídico de la totalidad de la evidencia, *Sanabria* v. *Sucn. González*, 82 D.P.R. 885 (1961). Es más, estimamos, como sugiere la recurrente, que el juez a quo no consideró ni pesó la prueba ofrecida por la demandada, hecho evidenciado por su negativa a hacer determinaciones de hechos adicionales según requerídole, a pesar de que las mismas se justificaban por la evidencia no contradicha que se había recibido.

Antes de resumir los aspectos de la prueba que son más pertinentes intentaremos una breve descripción del lugar en donde ocurrió el accidente, en las cercanías de la pieza de caña Núm. 442. Esta pieza está separada de la Núm. 440 por un camino que discurre en dirección de Norte a Sur, en cuyo extremo se intersecta con otro camino más ancho, formando la intersección la figura de una T. El camino de Norte a Sur, el más estrecho, es la línea vertical de la T; el otro camino principal, es la línea horizontal. Al Oeste del camino estrecho queda la pieza 442. A lo largo de ese camino, en la orilla de la pieza 442, hay una línea de postes de madera, con crucetas de madera que sostienen tres alambres paralelos. Cada alambre está asido a la cruceta por medio de un aislador de vidrio en forma de copa, que a su vez se sujeta a la cruceta por una espiga o tarugo de madera. Los postes tienen numeración consecutiva comenzando con el 309. En el 309-15, a la altura de la tercera cruceta (Exh. S de la demandada), hay un transformador para convertir el voltaje de 4,000 a 110 voltios. Desde ese poste las líneas cambian de rumbo y siguen hacia el Oeste a lo largo de la orilla Norte del camino principal. Este poste está sujeto a tierra por dos cables o tensores. El poste mide alrededor de 30 pies y se encuentra hincado en tierra como 5 pies. La primera cruceta, donde

ocurrió la ruptura, está a 29½ pies y los tensores parten de una altura de 27 pies y cruzan diagonalmente, uno el camino estrecho—tensor Este—y el otro el camino principal —tensor Sur. El tensor Este está anclado a una distancia de 32 1/2 pies dentro de la pieza Núm. 440.

Haremos a continuación un breve resumen de la prueba de las partes sobre la forma en que ocurrió el accidente, sin intentar hacer referencia más que a los rasgos salientes. La prueba de la demandada sobre la forma en que ocurrió la ruptura del alambre comenzó con el testimonio de *Víctor Santiago*, un mozalbete de 14 años, que se encontraba recogiendo rabos de caña en compañía de un amigo en las cercanías de la pieza 442. Declaró que vio dos máquinas de cargar caña, una vacía y otra llena, que venían en dirección contraria, y que al encontrarse no podían pasar por ser muy angosto el camino, que la máquina cargada se tiró a la orilla cayendo el último carretón a la zanja; que las dos máquinas utilizando una cadena intentaron sacar este carretón; y al hacerlo, el carretón se enredó en uno de los tensores del poste 309-15; que el halón fue tan fuerte que produjeron las caídas de unos "bolillos" del poste; que al las máquinas halar el carretón se movía el poste; que le avisó a un capataz llamado Pablo [se refiere a Pablo Torres Barranco] y luego se fue para un cocal desde donde observó que se partió uno de los cables del poste.

*William Quiñones*, ingeniero que trabaja con la demandada, declaró que concurrió al lugar del accidente para realizar una investigación, que observó un hueco o zanja en la base del poste demostrativa de que éste se había movido recientemente y que los alambres vientos se habían aflojado y uno de ellos se encontraba casi fuera del lugar en que anclaba; que vio además huellas de neumáticos en el borde del camino. Tomó varias fotografías en el acto sobre estos particulares las cuales identificó. Encontró además el aislador con el pedazo de alambre que había quedado unido al poste al ocurrir

la ruptura; que el alambre demostraba las características peculiares de un alambre que se ha partido al sométersele a tensión, o sea, que el extremo presenta una forma cónica. Realizó un experimento en presencia del tribunal sometiendo un alambre del mismo tipo y espesor a tensión y que muestra la misma forma cónica. Explicó unos croquis preparados a base de medidas tomadas por él para demostrar que las dos máquinas no podían pasar al encontrarse. Indicó que la queja que se recibió de parte de Rafael Famanía se refería a un pararrayos en el poste de la bomba Buscio situada como a 1,000 pies del poste 309-15.

*Luis Alfredo Pérez Flores*, detective que participó en la investigación, dijo que vio el hueco en la base del poste y los tensores "flojos", "como que habían sufrido un tirón". En sentido similar declaró el *Sargento William Correa Torres*, quien además dijo que el poste estaba inclinado.

*Evangelo Negrón* es el maquinista que conducía la máquina "garza" con los tres carretones cargados de caña. Atestó que al aproximarse al poste 309-15 se encontró con otro maquinista de nombre Gilberto Santiago que venía en dirección contraria; que al llegar a la curva, en la intersección de los caminos, ambos se echaron a la derecha para dar paso, y se le cayó el último carretón en la zanja, enredándose con un cable tensor del poste; que halaron el carretón con ambas máquinas, y que al hacerlo, el alambre se movía, y también el poste; que finalmente logró sacar el carretón y continuó la marcha.

Es interesante que Pablo Torres Barranco, uno de los testigos principales de la parte demandante, coloca a Gilberto Santiago, el conductor de la máquina con los carretones vacíos, en el lugar de los hechos, quien le apercibió "que tuviera cuidado que le caía el cordón encima". Esto necesariamente presupone que el alambre no se partió súbita e inesperadamente, sino que algo había ocurrido que justificaba anticipar que el alambre se partiría y podía caer sobre los que se encontraban cerca del lugar.

La versión de la parte demandante tiende a establecer que las líneas estaban en mal estado y que la Autoridad no ejerció la supervisión adecuada ni atendió oportunamente las advertencias que se le hicieron sobre el estado de las líneas. Al efecto ofrecieron el testimonio de *Rafael Famanía Ortiz,* quien vivía en las cercanías del lugar del accidente. Declaró que dos noches antes del accidente oyó una explosión en el poste 309-15; que a través de Pablo Torres Barranco hizo informar del hecho a la oficina local de la Autoridad; que permaneció sin servicio de luz hasta después de ocurrido el accidente. *Pablo Torres Barranco* declaró que después de ocurrida la caída del alambre se dirigió al pueblo a informar sobre el accidente y que el empleado de la demandada se demoró cerca de 15 minutos en salir para el lugar de la avería buscando guantes, alicates, etc. Se estableció también que los postes tenían cerca de 22 años de instalados. Igualmente los testigos hicieron referencia a que antes del accidente los tensores aparentaban estar "mongos".

Frente a esa prueba la Autoridad produjo el testimonio de su empleado *Víctor M. Martínez,* capataz de una brigada de celadores, quien declaró que 35 días antes había trabajado en la inspección de las líneas en la Colonia Mercado, y que como parte de ese trabajo, se cambiaron algunas espigas y se retesaron las líneas entre los postes 309-15 al 309-17; que el 27 de febrero se le informó que había un pararrayos roto en la bomba Buscio, que queda en las cercanías del lugar del accidente. Se ofreció en evidencia un informe diario de la labor realizada para corroborar este testimonio. *William Quiñones* declaró que la vida útil de los postes y las crucetas es de alrededor de 30 a 40 años.

La prueba pericial consistió del testimonio de los ingenieros Rafael R. Ramírez y Luis E. Fiol. *Ramírez* declaró extensamente sobre las posibles causas del rompimiento de un alambre señalando las siguientes: (1) el estiramiento del alambre sobre la tolerancia de elasticidad que produce su

adelgazamiento y eventualmente la ruptura, siendo su característica distintiva que la punta del alambre presenta una forma cónica; (2) el movimiento puede establecer un corto circuito y al ocurrir el contacto entre dos alambres fluye corriente excesiva que derrite parte del material y causa un debilitamiento que no permite una resistencia normal, siendo su característica esencial la presencia de burbujas en el área de la ruptura; (3) la existencia de una "oca" en el alambre por descuido en la instalación; (4) la vibración que produce un fatigamiento del metal. Confrontado con los hechos del caso, y especialmente con el pedazo de alambre que quedó unido al aislador—el rompimiento ocurrió como a 18 pulgadas del poste en una línea de alrededor de 283 pies—concluyó que la única causa atribuible era la de aplicación de exceso de tensión según corroborado por la forma cónica del extremo del alambre y excluyó la posibilidad de un corto circuito precisamente por el lugar en que ocurrió la ruptura y la ausencia de burbujas. Afirmó que no hay evidencia de que hubiera contacto con otro alambre y explicó que la ruptura puede que no ocurra simultáneamente con la aplicación de la tensión. Confirmó que el resultado del experimento llevado a cabo y las características que muestra el exhibit T son similares, si no idénticas.

El perito *Fiol*, presentado por la parte demandante, declaró que había examinado el exhibit T y había encontrado evidencia de la ocurrencia de un arco eléctrico que podía haber sido producido por un corto circuito. Se basó en que la superficie del alambre no es completamente lisa, sino que en algunos sitios es "bronca". Dijo además que un chispotazo produce un área de debilitamiento por la alta temperatura que se genera. Atribuyó la rotura del alambre a algún defecto partiendo de la base de que ocurrió con una fuerza de alrededor de 1,000 libras, o sea, la misma que causó que se partiera la espiga. En el contrainterrogatorio aceptó que el corto circuito tiene que haberse producido por el contacto

del alambre partido con otro alambre, y afirmó que "un alambre que parte no puede producir un corto circuito", aunque sí un arco eléctrico. Luego aclaró que "hay la posibilidad de que esto pueda haberse producido al producirse el arco, pero no creo que pueda producirse tampoco al despegarse el alambre debido a que está en tensión y al despegarse se tiene que despegar a pulgadas primero y después a pies, y a tres o cuatro pulgadas del arco no se va a sostener". En el redirecto aparentemente abandona la referencia al arco eléctrico y nuevamente afirma que "hubo un corto circuito de algún otro alambre en alguna ocasión".

No hay base alguna en la prueba para atribuir negligencia a los empleados de la demandada por no haber actuado con diligencia al no interrumpir el flujo de la corriente eléctrica una vez se les notificó del acaecimiento del rompimiento de la línea transmisora. Aun cuando pudiera merecer crédito esta parte del testimonio de Pablo Torres Barranco al efecto de que la persona a quien se dirigió en las oficinas de la Autoridad en Santa Isabel se demoró cerca de quince minutos mientras buscaba guantes, alicates y otros instrumentos necesarios para realizar la labor que de él se esperaba—a Torres se le confrontó en el contrainterrogatorio con una declaración que había prestado a un investigador en la cual no aportó este detalle sino que afirmó que el empleado salió para el lugar de los hechos inmediatamente—lo cierto es que no importa con cuanta celeridad se hubiese actuado no hubiese podido evitar el desafortunado desenlace. La prueba establece que tan pronto ocurrió la caída del alambre a tierra se originó un fuego en la pieza de caña inmediata y que fue atraídos por el fuego y la humareda que la víctima y el lesionado corrieron hacia el lugar. Sabemos que a empresas como la demandada no puede exigírsele respecto a la reparación de averías una responsabilidad absoluta, *Ramos* v. *Autoridad Fuentes Fluviales*, 86 D.P.R. 603 (1962) y que es

tolerable un tiempo razonable para verificar las gestiones y obras que conduzcan a evitar daños a terceras personas. Es una manifestación más de la conocida norma de previsibilidad.

Enfrentadas las teorías de las partes, relacionándolas con la prueba documental, material y pericial, la explicación que ofrece la parte demandada impresiona como más probable. La de la demandante prácticamente descansa en el hecho físico del rompimiento del alambre y la insinuación de que algo había ocurrido dos días antes que inició o aceleró un proceso de debilitamiento de las líneas. La de la demandada está corroborada por las fotografías que muestran que el poste fue movido aplicándole tal grado de fuerza que se movió dejando una grieta apreciable en su base. Por otro lado frente al testimonio pericial del ingeniero Ramírez, el del ingeniero Fiol se reduce a hacer una serie de especulaciones, imprecisas y vagas. Si en efecto ocurrió un corto circuito no hubiese sido difícil establecer tal hecho haciendo referencia a los alambres que hicieron contacto. Pero es que los inmediatos—las dos líneas paralelas de ambos extremos—no se quebraron o rompieron. Aun el propio Fiol en sus contestaciones admite que el alambre del centro estuvo sometido a tensión ya que alude a la tensión que causó que la espiga se desprendiera. A este respecto vale recordar que la única prueba sobre tensión la ofreció la demandada, atada a su versión sobre los halones que recibió el poste al intentar desatascar el carretón. Dentro de todas las circunstancias el análisis sereno y ponderado del largo récord nos conduce invariablemente a sostener que no se estableció responsabilidad de parte de la demandada y que su teoría es más consistente con los hechos físicos que demuestra la prueba.

*Se revocará la sentencia dictada por el Tribunal Superior, Sala de Ponce, en 31 de julio de 1963, y se declararán sin lugar las demandas.*