Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| REGENCY PARK ASSOCIATES, SE<br><br>Apelantes<br><br>v.<br><br>THE ENCANTO GIVING TREE, LLC<br>*h/n/c* ENCANTO<br><br>Apelados | KLAN202500086 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Manatí<br><br>Sobre: Cobro de Dinero Ordinario y otros<br><br>Caso Núm. MT2021CV00254 |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, el Juez Ronda del Toro y el Juez Pérez Ocasio

Domínguez Irizarry, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 18 de diciembre de 2025.

La parte apelante, Regency Park Associates, S.E. (Regency), comparece ante nos para que revoquemos la *Sentencia Enmendada* emitida por el Tribunal de Primera Instancia, Sala Superior de Manatí, el 17 de diciembre de 2024, notificada el 8 de enero de 2025. Mediante la misma, el Foro primario declaró *No Ha Lugar* una demanda sobre desahucio y cobro de dinero promovida por la parte apelante en contra de la parte apelada, The Encanto Giving Tree, LLC. (Encanto). A su vez, el tribunal declaró *Ha Lugar* la *Reconvención* incoada por la parte apelada.

Por los fundamentos que expondremos a continuación, se confirma la sentencia apelada.

### I

El 27 de abril de 2021, la parte apelante presentó la *Demanda* de epígrafe en contra de la parte apelada. En síntesis, alegó que la parte apelada le arrendó un espacio comercial ubicado en Plaza Atenas, localizado en el Municipio de Manatí, con el propósito de operar en el mismo un negocio de cannabis medicinal. Adujo que la

parte apelada estaba en posesión de dicho local en virtud de un contrato de arrendamiento suscrito entre las partes. A tenor con el referido contrato, arguyó que la parte apelada venía obligada a pagar mensualmente un canon de arrendamiento que ascendía a la suma de $6,387.75. En el pliego, la parte apelante sostuvo que la parte apelada había incumplido con la obligación de pagar los cánones de arrendamiento, adeudando, hasta la fecha de la presentación de la *Demanda,* la cantidad de $38,326.50, por este concepto.

Luego de varias incidencias procesales innecesarias de pormenorizar, el 28 de septiembre de 2021, la parte apelada presentó su *Contestación a Demanda y Reconvención.* Mediante la *Contestación a Demanda* negó las alegaciones formuladas en su contra y alegó que nunca pudo operar su negocio en el local comercial arrendado ya que la parte apelante, no habilitó la propiedad con conexión eléctrica, obligación que, según planteó, el contrato le imponía. Sobre esa premisa, sostuvo que había efectuado pagos de cánones de arrendamiento en exceso de lo estipulado. Específicamente, afirmó haber pagado aproximadamente $150,000.00 de más. A su vez, expuso que incurrió en alrededor de $50,000.00 en gastos de mejoras al sistema eléctrico y de sellado de techo, trabajos que, según indicó, correspondían contractualmente a la parte apelante. Por igual, la parte apelada afirmó que el incumplimiento contractual por parte de Regency le ocasionó pérdidas ascendentes a $250,000.00, al no poder operar el negocio para el cual arrendó la propiedad. Finalmente, planteó que el pleito debía ventilarse por la vía ordinaria, al existir controversia sobre la cuantía adeudada, los créditos por mejoras realizadas que alegó no habían sido satisfechos por Regency y la cuantía de los daños económicos que imputó a la parte apelante por incumplimiento contractual.

En la *Reconvención*, Encanto explicó que el contrato en cuestión había sido suscrito el 16 de agosto de 2016 para alquilar un local destinado a la operación de un dispensario de cannabis medicinal, con una vigencia de diez (10) años. Expuso que, conforme a sus términos, la parte apelante asumió la responsabilidad contractual del mantenimiento de las áreas comunes, la cual incluía la impermeabilización del techo del centro comercial donde ubicaba la propiedad objeto del arrendamiento y proveer la iluminación del área de estacionamiento de la propiedad arrendada. Asimismo, reiteró que la parte apelante tenía la obligación de garantizar una capacidad eléctrica adecuada hasta la entrada del contador del local arrendado.

Según se detalló, la parte apelada, el 18 de diciembre de 2019, se comunicó con la parte apelante para precisar los trabajos que, a su entender, correspondía a Regency realizar para que Encanto pudiera operar en la propiedad arrendada. Señaló que las tareas consistían en proveer electricidad al edificio, corregir filtraciones en el techo, pintar el exterior del edificio y reparar las aceras y el área de estacionamiento de la propiedad. En cuanto a los trabajos, la parte apelada indicó que Regency, solicitó y autorizó que Encanto ejecutara las mejoras que le correspondían a la parte apelante, con el compromiso de reembolsar los gastos al finalizar los mismos. En vista de lo anterior, sostuvo que contrató a Reyes Contractor Group, Inc. para realizar los mismos, los cuales se completaron y se facturaron entre los meses de enero y febrero de 2020. Ahora bien, según se expuso, la parte apelada notificó a la parte apelante un informe final de los trabajos realizados, el cual incluía las facturas y las fotografías correspondientes, y que la parte apelante reconoció haber recibido dicha documentación e indicó que la evaluaría. No obstante, sostuvo que nunca recibió el reembolso por los trabajos efectuados.

Del mismo modo, la parte apelada arguyó que, desde enero de 2017, pagó a la parte apelante la suma de $281,414.37, en concepto de cánones de arrendamiento, por un local que nunca pudo utilizar porque, según insistió, Regency no le proveyó la electricidad necesaria para operar el negocio. Fundamentándose en lo anterior, reclamó la devolución de todos los cánones de arrendamiento pagados y no aprovechados, debido al alegado incumplimiento contractual de Regency. Además, solicitó el reembolso de los $50,000.00 que afirmó haber invertido en trabajos eléctricos y de impermeabilización del techo de la propiedad. Finalmente, peticionó el pago de una suma no menor de $1,000,000.00 por las pérdidas en ganancias, dado a la imposibilidad de operar el local arrendado.

Tras ciertos trámites procesales innecesarios de pormenorizar, durante los días 22 de agosto y 26 de septiembre de 2023 se celebró el juicio en su fondo. Luego de evaluada la prueba presentada, el 8 de enero de 2025, el Tribunal de Primera Instancia notificó la *Sentencia Enmendada* aquí apelada. Conforme surge de la misma, durante la vista en su fondo, la parte apelante presentó a favor de sus argumentos los testimonios del señor Jorge Pérez Chacón y el señor José O. Padilla Flores. Por su parte, a fin de sustentar su postura, la parte apelada presentó en evidencia el testimonio del ingeniero Abelardo Hernández, el señor Víctor García Porrata, el señor Francisco Vergne Morell y el contratista de la compañía Reyes Contractor Group, el señor Félix J. Rosario Flores.

Conforme a la prueba evaluada, el Tribunal de Primera Instancia hizo las siguientes determinaciones de hechos:

1. La parte demandada, The Encanto Giving Tree, LLC, firmó un contrato de arrendamiento de un local comercial localizado en Plaza Atenas, Manatí, Puerto Rico.

2. El contrato de arrendamiento fue firmado el 16 de agosto de 2016 para la operación de un dispensario de cannabis medicinal.

3. El contrato estipulaba un canon de arrendamiento de $6,387.75 mensuales.

4. Al momento del alquiler, la parte demandada no se había percatado de ningún contratiempo con la propiedad dado que, al ser parte del centro comercial y existir otros comercios, entendían que todo debía estar establecido correctamente.

5. Al tener alquilado el local, se debía comenzar con el plan de trabajo conforme al cumplimiento de los estándares de la industria del cannabis.

6. El proceso de cumplimiento con el plan de trabajo para las operaciones del referido negocio de cannabis medicinal podía tardar alrededor de un año.

7. El plan de trabajo incluía: a. Instalación de bóvedas internas b. Instalación de cámaras, adentro y fuera del local c. Instalación de alarmas de seguridad d. Creación de entrada para que el cliente no tenga acceso hasta el área que se dispensa el producto.

8. El 20 de septiembre de 2017, ocurrió el embate del Huracán María a través de la isla de Puerto Rico.

9. A raíz del paso del Huracán María por la isla de Puerto Rico, la estructura del centro comercial sufrió daños.

10. Además de los daños como resultado del evento atmosférico antes mencionado, la parte demandada fue víctima de robo de la subestación, cables, cobre, y todo lo necesario para la energía eléctrica.

11. La parte demandada contrató a Reyes Contractor Group a través del Sr. Félix Rosario Flores y comenzaron sus labores en febrero de 2019.

12. Reyes Contractor Group fue contratado originalmente para trabajar los aires acondicionados, remodelación del interior, entre otros.

13. Al llevar a cabo una inspección del local arrendado, encuentran todo el sistema eléctrico vandalizado, y toda la cablería pertinente fue hurtada.

14. Las labores para las cuales originalmente fueron contratados se continuaron sin energía eléctrica, hasta tanto se decidiera quién se haría cargo de las referidas reparaciones.

15. Estos daños encontrados fueron informados verbalmente a la parte demandante, quienes son dueños de Regency Park Associates.

16. A solicitud de Reyes Contractor Group, se le requirió a Star Electrical Services & General Supplies, Inc. a realizar un Informe de Electrical Maintenance Test Report.

17. El informe fue rendido el 14 de mayo de 2019 por el Ingeniero Abelardo Hernández.

18. En las conclusiones rendidas en el Informe de Electrical Maintenance Test Report, se estableció que, como resultado de las pruebas realizadas, el equipo eléctrico estaba en buen funcionamiento, excepto por los tres "lightning arresters" existentes.

19. El informe recomendó hacer los arreglos pertinentes y volver a realizarle pruebas al sistema eléctrico.

20. Luego de varias comunicaciones verbales para que se llevaran a cabo los arreglos correspondientes, el 18 de diciembre de 2019, la parte demandada le notificó por escrito a la parte demandante, vía correo electrónico, los problemas del local arrendado que debían ser arreglados, siendo estos: a. Electricidad del edificio b. Filtraciones de agua por el techo c. Pintura del exterior del edificio d. Arregl[o]s de las aceras y estacionamiento de la propiedad[.]

21. La parte demandada le solicitó los arreglos a la parte demandante, toda vez que la obligación de Regency Park, para estos efectos, estaba contenida en el contrato de arrendamiento.

22. La obligación estaba estipulada en la cláusula 12 del contrato de arrendamiento, en síntesis, la misma lee: "The Landlord will clean and illuminate the parking area, clean, decorate and maintain in good condition all the common areas... The Landlord will repair the pavement, illumination, sidewalks, and sewers as necessary... The Landlord will maintain the impermeability of the roof of the Shopping Center..."

23. La obligación también estaba contenida en la cláusula 16 del contrato de arrendamiento, la misma lee: "The Landlord will deliver to the Tenant a "shell" with polish cement floors, rear cement wall with its exterior side plastered, interior demising walls of gypsum board or cement blocks at Landlords option, sanitary connections for the bathrooms, adequate electric capacity up to the pull out with empty conduit to the entrance of the location (includes common substation), paved parking with illumination, painted lines, sprinkler main through the Demised Premises, steel joist with steel roof with insulation".

24. La obligación también estaba contenida en la cláusula 26.12 del contrato de arrendamiento, la misma lee: "Landlord shall not be responsible for the supply of electricity to the Demised Premises, provided, however, Landlord shall be responsible for the maintenance of electrical wiring from the point said service enters the Shopping Center to the point where the Tenant's electrical utility meters are located".

25. Al no recibir respuestas de la parte demandante a lo solicitado, la parte demandada acordó con la parte demandante llevar a cabo los arreglos por su cuenta,

para que la parte demandante le reembolsara los mismos posteriormente.

26. Reyes Contractor Group, contratado por la parte demandada, realizó la reparación del sistema eléctrico y la impermeabilización del techo. El 12 de mayo de 2020, la parte demandada le realizó un pago, mediante cheque firmado y autorizado por Francisco J. Vergne Morell, de $150,000.00 a Reyes Contractor Group en concepto de las labores realizadas.

27. El 15 de mayo de 2020, Reyes Contractor Group depositó el cheque de $150,000.00 a su cuenta bancaria de First Bank.

28. Finalizados los trabajos eléctricos, se realizó una Certificación de Instalación Eléctrica, expedida por el Colegio de Peritos Electricistas.

29. La Certificación de Instalación Eléctrica contenía los arreglos realizados.

30. La Certificación de Instalación Eléctrica fue dejada en un buzón en las oficinas de LUMA Energy, en dos ocasiones distintas, sin nunca recibir alguna comunicación de los trámites a continuarse.

31. El 20 de noviembre de 2020, la parte demandante envió una carta de cobro de dinero a la parte demanda, cobrando una deuda de $38,326.50 por concepto de cánones de arrendamiento adeudados.

32. El 1 de diciembre de 2020, las partes tuvieron una reunión en la cual discutieron la solicitud de reembolso de las mejoras realizadas y/o un posible ajuste a los cánones de arrendamiento del local.

33. El 2 de diciembre de 2020, la parte demandante solicitó a la parte demandada que le enviara la documentación sobre los trabajos realizados y los costos asociados.

34. El 5 de diciembre de 2020, la parte demandada notificó a la parte demandante los trabajos realizados, incluyendo facturas y fotografías de los trabajos.

35. El 7 de diciembre de 2020, la parte demandante aceptó haber recibido los documentos y le informó a la parte demandada que estarían evaluando los mismos.

36. La parte demandada nunca recibió respuesta por la parte demandante en cuanto a rembolso o ajuste en los cánones de arrendamiento.

37. Los gastos incurridos por la parte demandada en concepto de mejoras, [impermeabilización] del techo y trabajos eléctricos ascendieron a $223,000.00.

38. Se desprende del testimonio del testigo Víctor García y de Exhibit 5 que la parte demandada pagó a la

parte demandante la cantidad de $236,889.12 en concepto de cánones de arrendamiento.

A tenor con sus determinaciones de hechos, el Tribunal de Primera Instancia determinó que la parte apelante incumplió sus obligaciones contractuales bajo el contrato de arrendamiento suscrito entre las partes el 16 de agosto de 2016. El foro primario dictaminó que la propiedad arrendada no estaba apta para ser utilizada, ya que carecía de lo necesario para establecer la conexión eléctrica. Destacó que el acuerdo suscrito entre las partes imponía a la apelante, en su carácter de arrendador, la obligación de proveer capacidad eléctrica adecuada al local, obligación que no cumplió.

El Tribunal también rechazó el planteamiento de la apelante de que la obligación de establecer la conexión eléctrica correspondía exclusivamente a la apelada. Reconoció que la apelada debía solicitar el servicio eléctrico ante la Autoridad de Energía Eléctrica o LUMA Energy, pero concluyó que no le correspondía realizar los trabajos y reparaciones previas necesarios para que dicho servicio pudiera instalarse. Determinó que esa responsabilidad recaía en la apelante, Regency, como propietaria del local, según lo estipulado en el contrato en controversia. Asimismo, resolvió que la impermeabilización del techo también era una obligación contractual de la parte apelante. Aunque reconoció que la parte apelada incumplió con su obligación de continuar pagando los cánones de arrendamiento estipulados, concluyó que, conforme a la doctrina establecida en *Álvarez v. Rivera,* 165 DPR 1 (2005), al incumplir la parte apelante con su propia obligación, esta no podía exigir el cumplimiento de la obligación a la parte apelada.

De otro lado, respecto a los cánones de arrendamiento pagados por la parte apelada, el Foro *a quo* estableció que la parte apelante continuó recibiendo pagos mensuales por una propiedad comercial inservible, debido a la ausencia de servicio eléctrico,

elemento indispensable para la operación del negocio. A base de ello, determinó que la apelada tenía derecho al reembolso de los cánones abonados por un local que nunca pudo utilizar.

Consecuentemente, el Tribunal de Primera Instancia resolvió que la parte apelante debía reembolsar a la apelada la suma de $223,000.00 por los gastos de mejoras, trabajos de impermeabilización y trabajos eléctricos realizados; debía pagar $40,000.00 adicionales por concepto de daños y pérdidas en ganancias debido a la imposibilidad de operar el local alquilado; y debía devolver la cantidad de $236,889.12 en concepto de cánones de arrendamiento pagados por la parte apelada. Asimismo, tras considerar la naturaleza del litigio, la cuantía en controversia y los esfuerzos profesionales desplegados, impuso a la apelante el pago de $5,000.00 en honorarios de abogado.

Inconforme con lo resuelto, el 5 de febrero de 2025, la parte apelante compareció ante nos mediante el presente recurso de apelación. En el mismo formula los siguientes señalamientos de error:

> Erró el TPI al aplicar la doctrina de *Exceptio Non Adimpletti Contractus* ya que resulta contrario al principio de la buena fe contractual según los hechos del presente caso ante el normativo *Álvarez v. Rivera*, 165 DPR 1 (2005).

> Erró el TPI al emitir sentencia enmendada que modifica retroactivamente las obligaciones contractuales de las partes, lo que resulta incompatible con la doctrina aplicable a contratos de arrendamiento y la naturaleza de las obligaciones de tracto sucesivo, como se ha discutido en *Campos Del Toro v. Tribunal Superior*, 75 DPR 370 (1953).

> Erró el TPI al responsabilizar a Regency por los defectos eléctricos y por consiguiente al desestimar el caso de cobro de dinero.

> Erró el TPI al indicar que Encanto había solicitado el reembolso de gastos alegadamente incurridos de mejoras y al conceder los mismos cuando la prueba demostró que antes de radicada la demanda únicamente se habían solicitado los gastos por arreglo de techo y facilidades eléctricas.

> Erró el TPI al aceptar prueba sobre un pago de $150,000.00 en donde no se presentó el original cancelado o cobrado como la exige la mejor prueba.
>
> Erró el TPI al imponerle al demandado-apelante la cuantiosa suma de $5,000.00 por concepto de honorarios de abogado por defender su causa ante el foro judicial en busca de una determinación justa.

Luego de examinar el expediente de autos, en conjunto con la transcripción de la prueba testimonial, y contando con el beneficio de la comparecencia de ambas partes, estamos en posición de adjudicar la presente controversia.

**II**

**A**

El Artículo 1206 del Código Civil de Puerto Rico, 31 LPRA ant. sec. 3371, dispone que existe un contrato desde que dos o más personas consienten a obligarse entre sí a dar alguna cosa o a prestar algún servicio.[1] *Batista Valentín v. Sucn. Batista Valentín,* 2025 TSPR 93, 216 DPR ___ (2025); *Cruz López v. Casa Bella y otros,* 213 DPR 980, 995 (2024). Las obligaciones derivadas de los contratos tienen fuerza de ley entre las partes y deben cumplirse a tenor con lo acordado. 31 LPRA ant. sec. 2994. La existencia de un contrato está sujeta a la necesaria concurrencia de los requisitos de consentimiento, objeto cierto y causa de la obligación que se establezca. *Batista Valentín v. Sucn. Batista Valentín,* supra; *Sonell Transit Serv. v. Junta de Subasta,* 2025 TSPR 85, 216 DPR ___ (2025). 31 LPRA ant. sec. 3391. Una vez perfeccionado, el mismo no sólo obliga a lo expresamente pactado, sino también a todas sus consecuencias de acuerdo a la buena fe, al uso y a la ley. 31 LPRA ant. sec. 3375. Acreditadas las condiciones exigidas para su validez, los contratos obligan a todos los involucrados y compete a los

---

[1] Dado a que los hechos de la presente causa acontecieron previo a la aprobación del Código Civil de 2020, el caso se debe disponer al amparo de lo estatuido en el Código Civil de 1930, cuerpo legal vigente al momento en el cual las partes firmaron el contrato.

tribunales velar por su efectivo cumplimiento. *Mercado, Quilichini v. U.C.P.R.*, 143 DPR 610, 627 (1997).

"El momento culminante de una relación obligacional es aquél en que el deudor se dispone a realizar la conducta; el dar hacer o no hacer, que constituye la prestación esperada por el acreedor." J.R. Vélez Torres, *Derecho de Obligaciones: Curso de Derecho Civil,* Segunda Edición, San Juan, Universidad Interamericana de Puerto Rico, Facultad de Derecho, 1997, pág. 159. De este modo, el cumplimiento constituye el curso normal de una relación obligatoria, por lo que, una vez se obtiene la pretensión pactada, opera la extinción del vínculo entre los sujetos que la integran. J.R. Vélez Torres, *supra.* En lo pertinente, en las *obligaciones bilaterales*, surge entre las partes involucradas una relación recíproca que implica que, entre éstas, tenga lugar el cumplimiento simultáneo de sus respectivos deberes, según asumidos. Como resultado, el ordenamiento jurídico vigente reconoce que "[l]a facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumple." 31 LPRA ant. sec. 3052. Así, quien vea defraudado su interés podrá elegir entre exigir el cumplimiento o la resolución de la obligación de que trate, con el resarcimiento de daños y el abono de los intereses en ambos casos. *Íd.*

Ahora bien, ante una reclamación por incumplimiento contractual, el estado de derecho provee al promovido en la acción pertinente la defensa del contrato no cumplido, o *exceptio non adimpleti contractus.* La misma constituye una excepción a la regla general que impone el deber de cumplir con el pacto asumido, ello cuando el demandante pretende exigir la acreencia debida a pesar de que ha incumplido de manera parcial o defectuosa con la prestación acordada. Siendo de este modo, la consecuencia principal de la aplicación de esta figura es que el demandado no

vendrá obligado a cumplir con su parte, hasta tanto el promovente de la acción observe su deber de manera total o libre de defectos. *Álvarez v. Rivera*, 165 DPR 1, 20 (2005).

Por su parte y en lo aquí pertinente, en el *contrato de arrendamiento,* una de las partes, llamada *arrendador*, confiere a la otra, denominada *arrendatario*, el goce o uso de una cosa por tiempo determinado y a cambio de un precio cierto. 31 LPRA ant. secs. 4012, 4031. Conforme a la interpretación doctrinal del referido negocio, el ordenamiento jurídico vigente reconoce que el mismo supone la cesión del derecho a disfrutar determinado bien por cierto término y a cambio de una renta periódica, sin que con ello se transmita su titularidad. J.R. Vélez Torres, *Curso de Derecho Civil; Derecho de Contratos,* San Juan, Universidad Interamericana de Puerto Rico, Facultad de Derecho, 1990, T. IV, Vol. II, pág. 267. Por sus propiedades, el contrato de arrendamiento es uno de carácter consensual, siendo el único requisito para su validez el mero acuerdo entre las partes. 31 LPRA ant. sec. 3451. Dado a las obligaciones mutuas que genera entre los contratantes, este tipo de convenio también se reputa bilateral, puesto que, mientras uno se obliga a entregar y a permitir el goce pleno y pacífico de la cosa objeto de arrendamiento durante el término estipulado, el otro está llamado a ejercer su derecho de manera diligente, según pactado, mediante el correspondiente desembolso del precio convenido. 31 LPRA ant. secs. 4051, 4052.

En un contrato de arrendamiento, el arrendador tiene el deber de observar el fiel cumplimiento de las siguientes obligaciones: 1) entregar al arrendatario la cosa objeto de contrato; 2) hacer en ella, durante el arrendamiento, todas las reparaciones necesarias a fin de conservarla en estado de servir para el uso a que ha sido destinada; 3) mantener al arrendatario en el goce pacífico por todo el tiempo del contrato y; 4) suscribir y entregar al arrendatario un

recibo por cada pago hecho por éste. 31 LPRA ant. sec. 4051. Por su parte, el arrendatario viene llamado a: 1) pagar el precio del arrendamiento en los términos convenidos; 2) usar la cosa arrendada como un buen padre de familia destinándola a lo pactado, y, en defecto de pacto, al que se infiera de la naturaleza de la cosa arrendada y; 3) a pagar los gastos que ocasione la escritura del contrato. 31 LPRA ant. sec. 4052. Ahora bien, si el arrendador o el arrendatario no cumplieren las obligaciones expresadas anteriormente, podrán pedir la recisión del contrato y la indemnización de daños y perjuicios, o sólo esto último, dejando el contrato subsistente. 31 LPRA ant. sec. 4053.

**B**

Es por todos sabido que, para probar el *contenido* de un escrito, grabación o fotografía, el ordenamiento exige la presentación del *original* de éstos. Regla 1002, Reglas de Evidencia, 32 LPRA Ap. VI, R. 1002. La doctrina interpretativa del referido estatuto reconoce que dicha norma responde al interés de imprimir confiabilidad y certeza al proceso pertinente, evadiendo así toda posibilidad de manipulación, fabricación u omisiones, respecto a la veracidad del contenido del documento o fotografía que se pretende presentar en evidencia. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño 2010*, 3ra Ed., San Juan, Ed. Situm Inc., 2010, pág. 579. Ahora bien, en materia de derecho probatorio, es premisa cardinal que un *duplicado* es tan admisible como el original mismo, ello salvo que surja una genuina controversia respecto a la autenticidad del original o que, bajo ciertas circunstancias, resulte injusta su admisibilidad. 32 LPRA Ap. VI, R. 1003.

En el anterior contexto, la norma es clara al disponer que no es suficiente una mera alegación respecto a la legitimidad del original. Siendo así, el interesado en objetar la admisibilidad de un duplicado está llamado a establecer *prima facie* algún indicio de

fraude o controversia en cuanto a la autenticidad del original. Por otro lado, la salvedad que propone descartar el ofrecimiento en evidencia de un duplicado, en ocasión a que se estime injusta su admisibilidad *versus* la del original, debe interpretarse restrictivamente. E.L. Chiesa Aponte, *Reglas de Evidencia de Puerto Rico 2009,* San Juan, Publicaciones JTS, 2009, pág. 312. Por tanto, si se cumple con la definición que, en cuanto al mismo, el estado de derecho dispone y salvo disposición en contrario, los tribunales de justicia no tienen discreción alguna para negarse a acogerlo.

Ahora bien, conforme lo establecido por el ordenamiento probatorio vigente:

> La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:
>
> [...]
>
> (d) La evidencia directa de una persona testigo que merezca entero crédito, es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.
>
> [...].
>
> Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110.

En reiteradas ocasiones, nuestro sistema de derecho ha reconocido que el testimonio de un solo testigo, cuando éste pretende declarar sobre un hecho, es suficiente para que el mismo quede establecido. De este modo, sirviendo dicha declaración para afirmar la ocurrencia, o no, de determinado evento, no se hace necesaria la presentación ulterior de prueba adicional para corroborar lo narrado por un testigo competente, salvo así se requiera. *Federation Des. Ind. v. Ebel,* 172 DPR 615 (2007); *Santiago Otero v. Méndez,* 135 DPR 540 (1994).

**c**

Por su parte, la *temeridad* constituye aquel patrón de conducta que lleva a una de las partes a incurrir en los gastos de un litigio cuya controversia pudo haberse resuelto fuera de los tribunales y que afecta la sana administración de la justicia. *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 126 (2013); *Consejo Titulares v. MAPFRE*, 2024 TSPR 140, 215 DPR ___ (2024); *Blás v. Hosp. Guadalupe*, 146 DPR 267, 335 (1998)*; Torres Ortiz v. ELA*, 136 DPR 556 (1994). Una parte ha incurrido en temeridad cuando está presente alguna de las siguientes circunstancias: 1) contestar una demanda y negar responsabilidad total; 2) defenderse injustificadamente de la acción en su contra; 3) creer que la cantidad reclamada es exagerada y que tal sea el único motivo por el cual se opone a las alegaciones del demandante, pudiendo limitar la controversia a la fijación de la correspondiente cuantía; 4) incurrir en un litigio del cual *prima facie* se desprende su responsabilidad y; 5) negar un hecho cuya veracidad conste. *Blas v. Hosp. Guadalupe,* supra, págs. 335-336*; Fernández v. San Juan Cement Co., Inc.,* 118 DPR 713 (1987).

Una vez un tribunal con competencia determina que se ha incurrido en temeridad, está llamado a imponer, a la parte que así haya actuado, el pago de cierta cantidad de dinero en concepto de *honorarios de abogado. Torres Montalvo v. Gobernador ELA,* 194 DPR 760, 778 (2016). Al respecto, la Regla 44.1 (d) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1 (d), dispone como sigue:

(d) *Honorarios de Abogado* - En caso de que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. En caso de que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o instrumentalidades haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté

expresamente exento por ley del pago de honorarios de abogado.

El antedicho estatuto preceptúa en nuestro esquema procesal la intención de establecer una penalidad a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito. *Asoc. Salud Primaria y otros v. ELA,* 2025 TSPR 75, 216 DPR ___ (2025); *SLG González-Figueroa v. SLG et al.,* 209 DPR 138, 148 (2022): *Torres Montalvo v. Gobernador ELA,* supra, pág. 778, citando a *Andamios de PR v. Newport Bonding,* 179 DPR 503, 520 (2010). De ahí que, como regla general, establecida la concurrencia de tal conducta, la condena de honorarios resulta ser imperativa. Así, el juzgador tendrá que adjudicar el monto correspondiente al grado de temeridad desplegado por el actor, ello mediante el ejercicio de su sano juicio. De este modo, la determinación que en su día emita sólo será objeto de revisión si ha mediado *abuso de discreción* en el ejercicio de su ministerio. *Colón Santos v. Coop. Seg. Múlt. P.R.,* 173 DPR 170, 188 (2008).

**D**

Finalmente, es premisa reiterada en nuestro ordenamiento jurídico que, en ausencia de pasión, prejuicio, error manifiesto o parcialidad, los tribunales intermedios no habrán de intervenir con la apreciación y la adjudicación de credibilidad de la prueba que realizan los tribunales de instancia. *Gómez Márquez et al. v. El Oriental,* 203 DPR 783, 794 (2020); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013); *Rodríguez v. Nationwide Insurance,* 156 DPR 614, 623 (2002); *Argüello v. Argüello,* 155 DPR 62, 79-80 (2001). Como norma, un tribunal apelativo está impedido de sustituir o descartar, por sus propias apreciaciones, las determinaciones de hecho que realiza el foro sentenciador,

fundamentando su proceder en un examen del expediente sometido a su escrutinio. *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2007); *Rolón v. Charlie Car Rental, Inc.,* 148 DPR 420, 433 (1999). Asimismo, las determinaciones de credibilidad que realiza el tribunal primario están revestidas de una presunción de corrección, razón por la cual, en este aspecto, gozan de un amplio margen de deferencia por parte del foro intermedio. *Dávila Nieves v. Meléndez Marín,* supra; *Argüello v. Argüello,* supra; *Blás v. Hosp. Guadalupe,* 146 DPR 267, 309 (1998).

De ordinario, el Tribunal de Primera Instancia es quien está en mejor posición para aquilatar la prueba testifical que ante sí se presentare, puesto que es quien oye y observa declarar a los testigos. *Dávila Nieves v. Meléndez Marín,* supra, pág. 771; *ELA v. PMC,* 163 DPR 478, 490 esc. 6 (2004). Por tanto, el juzgador de primera instancia goza de preeminencia al poder apreciar sus gestos, contradicciones, manierismos, dudas y vacilaciones, oportunidad que le permite formar en su conciencia la convicción de si dicen, o no, la verdad. *López v. Dr. Cañizares,* 163 DPR 119, 136 (2004). Ahora bien, la normativa antes expuesta no es de carácter absoluto. El criterio de deferencia no se justifica cuando el tribunal revisado considera, solamente, prueba documental o pericial. *ELA v. PMC,* supra. Al respecto, sabido es que los tribunales revisores tienen amplia discreción en la apreciación de la prueba pericial, pudiendo, inclusive, adoptar su propio criterio en su evaluación, y hasta descartarla, aunque resulte técnicamente correcta. *Mun. de Loíza v. Sucns. Suárez et al.,* 154 DPR 333, 363 (2001). Ello así puesto que, al entender sobre este tipo de evidencia, el tribunal intermedio está en la misma posición que el Tribunal de Primera Instancia. *Ortiz Rodríguez v. AFF,* 94 DPR 546, 549-550 (1967). De igual forma, una apreciación incorrecta de la prueba tampoco ostenta inmunidad frente a la función revisora del tribunal

apelativo. Si bien el arbitrio y la discreción del foro primario es respetable, sus dictámenes están sujetos a que los mismos se emitan conforme a los principios de legalidad y justicia. *Méndez v. Morales*, 142 DPR 26, 36 (1996).

**III**

En el recurso de apelación ante nuestra consideración, sostiene la parte apelante que el Tribunal de Primera Instancia incidió al aplicar la doctrina de *exceptio non adimpleti contractus*, por entender que dicha aplicación resulta contraria al principio de la buena fe contractual. De igual modo, aduce que erró el foro sentenciador al emitir una sentencia enmendada que, a su juicio, modificó retroactivamente las obligaciones contractuales de las partes en el contrato en controversia. Asimismo, plantea que el Tribunal de instancia erró al responsabilizar a Regency por los defectos eléctricos del local arrendado y, por consiguiente, al desestimar su causa de acción de cobro de dinero. Alega, además, que el foro primario erró al concluir que Encanto había solicitado el reembolso de gastos por alegadas mejoras y al concederlos cuando, según indica, de la demanda únicamente surge gastos asociados a la impermeabilización del techo y a las facilidades eléctricas. Señala también que erró el Tribunal al admitir prueba relativa a un pago de $150,000.00 sin la presentación del documento original cancelado, lo que, a su entender, contraviene la doctrina de la mejor prueba. Finalmente, la parte apelante cuestiona la legitimidad de la imposición de $5,000.00 por concepto de honorarios de abogado. Habiendo examinado los referidos señalamientos, a la luz del derecho aplicable a la controversia de autos, resolvemos coincidir con lo resuelto. En consecuencia, confirmamos el dictamen apelado.

Un examen del expediente que nos ocupa nos mueve a concluir que la determinación aquí impugnada es una correcta en derecho. Nada en los documentos sometidos a nuestro haber,

establece que, en el ejercicio de su gestión adjudicativa, el Tribunal de Primera Instancia haya incurrido en error tal, que nos veamos llamados a suprimir la eficacia de lo resuelto. A nuestro juicio, el dictamen que nos ocupa, en efecto, responde a la naturaleza de los respectivos derechos y obligaciones de las partes, según expresamente convenidos en el contrato de arrendamiento en disputa.

Por estar íntimamente relacionados, discutiremos en conjunto, al igual que la parte apelante, los primeros tres señalamientos de error.

Según esbozáramos, en el contrato de arrendamiento, el arrendador confiere al arrendatario, el goce o uso de una cosa por tiempo determinado y a cambio de un precio cierto. 31 LPRA ant. secs. 4012, 4031. En este negocio jurídico, de carácter bilateral, el arrendador tiene el deber de observar el fiel cumplimiento de las siguientes obligaciones: 1) entregar al arrendatario la cosa objeto de contrato; 2) hacer en ella, durante el arrendamiento, todas las reparaciones necesarias a fin de conservarla en estado de servir para el uso a que ha sido destinada; 3) mantener al arrendatario en el goce pacífico por todo el tiempo del contrato y; 4) suscribir y entregar al arrendatario un recibo por cada pago hecho por éste. 31 LPRA ant. sec. 4051. Por su parte, el arrendatario viene llamado a: 1) pagar el precio del arrendamiento en los términos convenidos; 2) usar la cosa arrendada como un buen padre de familia destinándola a lo pactado, y, en defecto de pacto, al que se infiera de la naturaleza de la cosa arrendada y; 3) a pagar los gastos que ocasione la escritura del contrato. 31 LPRA ant. sec. 4052. Ahora bien, si el arrendador o el arrendatario no cumplieren las obligaciones expresadas anteriormente, podrán pedir la recisión del contrato y la indemnización de daños y perjuicios, o sólo esto último, dejando el contrato subsistente. 31 LPRA ant. sec. 4053.

En atención a lo previamente esbozado, ante una reclamación por incumplimiento contractual, el estado de derecho provee al promovido en la acción pertinente la defensa del contrato no cumplido, o *exceptio non adimpleti contractus.* La misma constituye una excepción a la regla general que impone el deber de cumplir con el pacto asumido, ello cuando el demandante pretende exigir la acreencia debida a pesar de que ha incumplido de manera parcial o defectuosa con la prestación acordada. Siendo de este modo, el demandado no vendrá obligado a cumplir con su parte, hasta tanto el promovente de la acción observe su deber de manera total o libre de defectos. *Álvarez v. Rivera*, 165 DPR 1 (2005).

En el caso ante nuestra consideración, un examen del contrato de arrendamiento suscrito entre las partes el 16 de agosto de 2016 nos permite constatar que, en lo pertinente a los errores esgrimidos, las obligaciones asumidas por la parte apelante estaban claramente definidas en las cláusulas 12, 16 y 26.12 del acuerdo. Conforme a tales disposiciones, el arrendador debía limpiar, decorar y conservar en buen estado las áreas comunes y el estacionamiento; reparar, según fuera necesario, el pavimento, la iluminación, las aceras y los desagües; mantener la impermeabilidad del techo del centro comercial;[2] entregar al arrendatario un local con capacidad eléctrica adecuada hasta la entrada del contador;[3] y asumir el mantenimiento de todo el sistema de cablería eléctrica desde el punto en que el servicio entra al centro comercial hasta el área

---

[2] Apéndice del recurso, pág. 159. La cláusula 12 del contrato en cuestión dispone:

> The Landlord will clean and illuminate the parking area, clean, decorate and maintain in good condition all the common areas [...].
> The Landlord will repair the pavement, illumination, sidewalks, and sewers as necessary [...]. The Landlord will maintain the impermeability of the roof of the Shopping Center [...].

[3] Apéndice del recurso, pág. 161. La cláusula 16 del contrato dispone: "The Landlord will deliver to the Tenant a "shell" with [...] adequate electric capacity up to the pull out with empty conduit to the entrance of the location (includes common substation) [...]."

donde ubican los contadores.[4] Por su parte, la parte apelada venía llamada a pagar el canon de arrendamiento ascendente a $6,387.75 mensuales.

Por otra parte, al remitirnos a la *Transcripción de la Prueba Oral* surge que, el presidente de la compañía Encanto Giving Tree, LLC, Francisco J. Vergne Morell, declaró que la parte apelada no pudo operar el negocio para el cual arrendó el local, debido a la ausencia de electricidad en el edificio, la filtración de agua por el techo y la necesidad de realizar trabajos de pintura exterior, así como de reparaciones en las aceras y el estacionamiento.[5] Indicó que notificó tales deficiencias a Regency y añadió que, ante la inacción de la parte apelante para atender los arreglos que contractualmente le correspondían, Encanto acordó asumirlos, con la garantía de que serían reembolsados.[6] Precisó que remitió las facturas relacionadas con dichos trabajos y que nunca recibió reembolso alguno. A lo antes expuesto, resulta preciso sumar el testimonio del señor Jorge Pérez Chacón, encargado de gestionar los cobros de dinero en Regency. Este, testificó que, desde el inicio del contrato en agosto de 2016 hasta el 1 de junio de 2019, la parte apelada cumplió cabalmente con su obligación de pagar los cánones de arrendamiento.[7] A nuestro juicio, tal cuadro fáctico demuestra que fue la parte apelante quien, en principio, incumplió las obligaciones contractuales que le imponía el contrato de arrendamiento.

Por lo tanto, contrario a lo argüido por la parte apelante en sus primeros tres señalamientos de error, observamos que el Foro

---

[4] Apéndice del recurso, pág. 170. La cláusula 26.12 del contrato dispone: "Landlord shall be responsible for the maintenance of electrical wiring from the point said service enters the Shopping Center to the point where the Tenant's electrical utility meters are located."

[5] Transcripción de la Prueba Oral de la vista celebrada el 26 de septiembre de 2023, pág. 22.

[6] *Íd.*, págs. 36-37.

[7] Transcripción de la Prueba Oral de la vista celebrada el 22 de agosto de 2023, pág. 68.

de instancia evaluó correctamente la extensión y los efectos del incumplimiento contractual de la parte apelante sobre la ejecución de las obligaciones de la parte apelada. Conforme indicáramos, el contrato de arrendamiento es uno que exige el recíproco cumplimiento de los deberes atribuidos a los suscribientes. No obstante, en ocasión a que alguno de ellos vea lacerado el interés esperado, tiene plena legitimación para reclamar la reivindicación de sus derechos. Ahora bien, tal no puede ser la ocasión cuando quien exige el cumplimiento específico, no realizó debidamente su parte del pacto. Siendo así, resulta forzoso concluir que los errores señalados no se cometieron.

En lo que atañe a los señalamientos cuarto y quinto, la parte apelante sostiene que el Tribunal de Primera Instancia erró al concluir que la parte apelada había solicitado el reembolso de gastos por mejoras al local, toda vez que, según aduce, antes de la radicación de la demanda únicamente se habían reclamado los gastos asociados al arreglo del techo y a las facilidades eléctricas. Asimismo, plantea que erró el foro sentenciador al admitir prueba relativa a un pago de $150,000.00 sin la presentación del documento original cancelado. No le asiste la razón. Veamos.

Según surge de la *Transcripción de la Prueba Oral,* el señor Víctor García Porrata, accionista de Encanto Giving Tree, LLC, declaró que la parte apelada contrató a la compañía Reyes Contractor Group para realizar los trabajos necesarios a fin de habilitar el local conforme al propósito pactado. Señaló que Reyes Contractor Group facturó a Encanto la suma de $223,000.00 por la totalidad de los trabajos realizados y que Encanto efectuó un pago parcial de $150,000.00, el cual fue recibido por la compañía contratada.[8]

---

[8] Transcripción de la Prueba Oral de la vista celebrada el 22 de agosto de 2023, pág. 148.

Del mismo modo, según surge de la *Transcripción de la Prueba Oral*, el contratista Félix J. Rosario Flores, contratista de la compañía Reyes Contractor Group, la empresa fue inicialmente contratada para llevar a cabo la remodelación interior del local, lo que incluía la instalación de losas, aires acondicionados y otros trabajos internos. No obstante, al realizar una inspección ocular de la propiedad, advirtió que el sistema eléctrico se encontraba en total estado de abandono. Explicó que el equipo indispensable para establecer la conexión eléctrica estaba vandalizado, que se habían sustraído cables, que las bases del contador de electricidad estaban rotas y que no existía conexión entre los puntos necesarios para energizar la propiedad.[9] Añadió que, ante la ausencia de electricidad y las filtraciones en el techo, cualquier labor realizada en el interior del local se deterioraba nuevamente. Por tal razón, Reyes Contractor Group fue contratado para llevar a cabo la reparación de la cablería eléctrica y la impermeabilización del techo. Finalmente, expresó que recibió de Encanto el pago parcial de $150,000.00 y lo depositó en la cuenta de banco de Reyes Contractor Group.[10]

Correspondía a la parte apelante impugnar las alegaciones relativas a la totalidad de los trabajos realizados por Reyes Contractor Group por la suma de $223,000.00, pues fue a partir de los testimonios del señor Víctor García Porrata y el señor Félix J. Rosario Flores, que quedaron expuestas las labores cuya compensación se reclamaba, quedando en ese momento procesal enmendadas las alegaciones de la reclamación en su contra.

De igual modo, respecto al planteamiento relativo al pago de $150,000.00, según esbozado previamente, el ordenamiento probatorio reconoce que un duplicado es tan admisible como el

---

[9] Transcripción de la Prueba Oral de la vista celebrada el 26 de septiembre de 2023, pág. 119.
[10] Transcripción de la Prueba Oral de la vista celebrada el 26 de septiembre de 2023, pág. 185.

original, salvo que surja una controversia genuina respecto a su autenticidad, circunstancia que impone al objetante la carga de presentar *prima facie* algún indicio de fraude o duda sobre el documento, lo cual no ocurrió en el caso de autos. Asimismo, conforme al estándar probatorio vigente, el testimonio de un solo testigo debidamente aquilatado por el Tribunal de Primera Instancia es suficiente para establecer un hecho sin necesidad de ulterior corroboración. Siendo así, y no advirtiendo desviación alguna del derecho aplicable en la admisión y valoración de la prueba desfilada, resolvemos que los señalamientos de error cuarto y quinto no se cometieron.

Finalmente, sobre el planteamiento mediante el cual la parte apelante impugna la imposición del pago de $5,000.00 por concepto de honorarios de abogado, resolvemos no imponer nuestro criterio sobre el desplegado por el tribunal sentenciador. Tal y como indicáramos, la imposición de honorarios de abogado es una determinación discrecional del Adjudicador, ello de conformidad con la conducta procesal de las partes durante el curso del litigio sometido a su consideración.

Por ostentar inmediatez sobre los trámites desplegados ante sí, el foro primario está en una posición privilegiada para juzgar el alcance, las motivaciones y las consecuencias de la ejecución de los litigantes en el procedimiento que atiende. Así, y en ausencia de prueba que establezca que, en dicha gestión, el Juzgador transgredió los límites normativos impuestos a la ejecución de sus facultades adjudicativas, este Foro viene llamado a mostrarse deferente ante el pronunciamiento que al respecto emita. De este modo, dado a que nada en el expediente sugiere que, en el caso de autos, el Tribunal de Primera Instancia actuó en contravención a los términos que el estado de derecho impone a sus funciones y por

estimar como razonable su determinación en la presente materia, sostenemos la misma.

**IV**

Por los fundamentos que anteceden, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones